UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GEORGE SANTOS,

     Plaintiff,

   - against -

JAMES C. KIMMEL a/k/a JIMMY KIMMEL,
AMERICAN BROADCASTING COMPANIES,
INC., and THE WALT DISNEY COMPANY,

     Defendants.

Case No. 1:24-cv-01210-DLC

---

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS COMPLAINT

Nathan Siegel
Eric Feder
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
(202) 973-4200
nathansiegel@dwt.com
ericfeder@dwt.com

Raphael Holoszyc-Pimentel
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
(212) 489-8230
rhp@dwt.com

*Attorneys for Defendants James C. Kimmel a/k/a
Jimmy Kimmel, American Broadcasting Companies,
Inc., and The Walt Disney Company*

**TABLE OF CONTENTS**

<b>Page</b>

PRELIMINARY STATEMENT .................................................................................1

FACTUAL ALLEGATIONS ...................................................................................2

    A.    The Parties ............................................................................... 2

    B.    Cameo Videos .......................................................................... 2

        1.    Users and Cameo Videos ............................................. 3

        2.    Talent and Cameo Videos ............................................ 4

    C.    Public Scrutiny of Santos' Resort to Making Cameo Videos ................................ 4

    D.    Kimmel's Critique of Santos' Cameo Videos ....................................... 6

    E.    The Complaint ........................................................................ 8

LEGAL STANDARD...........................................................................................8

ARGUMENT .....................................................................................................9

I.    SANTOS' COPYRIGHT CLAIM IS BARRED BY THE FAIR USE DOCTRINE.........9

    A.    The Purpose and Character of the Use Was Highly Transformative................... 10

    B.    The Nature of the Copyrighted Work Was Minimally Creative and Was Previously Published........................................................ 17

    C.    The Portion Used Was Integral to the Criticism.................................... 19

    D.    The Use Had No Effect on the Market Because There Is No Viable Market for Critical Broadcast Use of Cameo Videos ........................... 20

II.    THE FRAUD CLAIM FAILS FOR LACK OF OUT-OF-POCKET LOSS ...................21

III.    THE REMAINING CLAIMS ARE PREEMPTED BY THE COPYRIGHT ACT .........23

CONCLUSION....................................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adjmi v. DLT Ent. Ltd.*,
    97 F. Supp. 3d 512 (S.D.N.Y. 2015)................................................................9, 20

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
    598 U.S. 508 (2023).................................................................10, 11, 13, 14

*Arrow Prods., Ltd. v. Weinstein Co.*,
    44 F. Supp. 3d 359 (S.D.N.Y. 2014)................................................................9

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................8

*Authors Guild v. Google, Inc.*,
    804 F.3d 202 (2d Cir. 2015)................................................................11, 14

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................8

*Blanch v. Koons*,
    467 F.3d 244 (2d Cir. 2006)................................................................14, 17

*Boesen v. United Sports Publ'ns, Ltd.*,
    No. 20-CV-1552 (ARR) (SIL), 2020 WL 6393010 (E.D.N.Y. Nov. 2, 2020) .........................4

*Bray v. Purple Eagle Ent., Inc.*,
    No. 18 Civ. 5205 (GBD) (SLC), 2024 WL 553961 (S.D.N.Y. Jan. 3, 2024).........................25

*Brody v. Fox Broad. Co.*,
    No. 22cv6249 (DLC), 2023 WL 2758730 (S.D.N.Y. Apr. 3, 2023) (Cote, J.) .......................9

*Bus. Casual Holdings, LLC v. YouTube, LLC*,
    No. 21-CV-3610 (JGK), 2022 WL 837596 (S.D.N.Y. Mar. 21, 2022)................................3

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994)................................................................14, 18, 19, 20

*Clark v. Transp. Alts., Inc.*,
    No. 18 Civ. 9985 (VM), 2019 WL 1448448 (S.D.N.Y. Mar. 18, 2019) .................................9

*Cole v. John Wiley & Sons, Inc.*,
    No. 11 Civ. 2090(DF), 2012 WL 3133520 (S.D.N.Y. Aug. 1, 2012) .................................22

*Condit v. Dunne,*
    317 F. Supp. 2d 344 (S.D.N.Y. 2004)...................................................................4

*In re DMCA Section 512(h) Subpoena to YouTube (Google, Inc.),*
    581 F. Supp. 3d 509 (S.D.N.Y. 2022)................................................................17

*Dow Jones & Co., Inc. v. Juwai Ltd.,*
    No. 21-cv-7284 (PKC), 2023 WL 2561588 (S.D.N.Y. Mar. 17, 2023) ................................24

*Fioranelli v. CBS Broad. Inc.,*
    551 F. Supp. 3d 199 (S.D.N.Y. 2021)................................................................15

*Food Lion v. Capital Cities/ABC,*
    194 F.3d 505 (4th Cir. 1999) .......................................................................23

*Forest Park Pictures v. Universal Television Network, Inc.,*
    683 F.3d 424 (2d Cir. 2012).........................................................................24

*Frome v. Renner,*
    26 Media L. Rep. (BNA) 1956 (C.D. Cal. 1997)....................................................23

*Google LLC v. Oracle Am., Inc.,*
    593 U.S. 1 (2021)..................................................................................18

*Gottlieb Dev. LLC v. Paramount Pictures Corp.,*
    590 F. Supp. 2d 625 (S.D.N.Y. 2008)...............................................................6

*Harbus v. Manhattan Inst. for Pol'y Res.,*
    No. 19 Civ. 6124 (ER), 2020 WL 1990866 (S.D.N.Y. Apr. 27, 2020) ...................................9

*Homsy v. King World Ent., Inc.,*
    No. 01-96-00708-CV, 1997 WL 52154 (Tex. Ct. App. Feb. 6, 1997) ...................................23

*Hosseinzadeh v. Klein,*
    276 F. Supp. 3d 34 (S.D.N.Y. 2017)................................................................12

*Hughes v. Benjamin,*
    437 F. Supp. 3d 382 (S.D.N.Y. 2020).........................................................4, 9, 12

*Hustler Mag., Inc. v. Falwell,*
    485 U.S. 46 (1988).................................................................................14

*IBM Corp. v. Micro Focus (US), Inc.,*
    676 F. Supp. 3d 263 (S.D.N.Y. 2023)..............................................................24

*Ithaca Cap. Invs. I S.A. v. Trump Panama Hotel Mgmt. LLC,*
    450 F. Supp. 3d 358 (S.D.N.Y. 2020)..............................................................21

iii

*Kane v. Comedy Partners*,
No. 00 Civ. 158(GBD), 2003 WL 22383387 (S.D.N.Y. Oct. 16, 2003), *aff'd*,
98 F. App'x 73 (2d Cir. 2004) ...................................................................................11, 12, 16

*Kaplan Grp. Invs. LLC v. A.S.A.P. Logistics Ltd.*,
No. 22-CV-7326 (JPO), 2023 WL 6214909 (S.D.N.Y. Sept. 25, 2023) ...............................23

*Kelly-Brown v. Winfrey*,
717 F.3d 295 (2d Cir. 2013)....................................................................................................9

*Kimberley v. Penguin Random House*,
No. 17-CV-5107-LTS-KHP, 2018 WL 1918614 (S.D.N.Y. Apr. 19, 2018)..........................18

*La Luna Enters., Inc. v. CBS Corp.*,
74 F. Supp. 2d 384 (S.D.N.Y. 1999).....................................................................................23

*Larson v. Dorland*,
No. 1:19-CV-10203-IT, 2023 WL 5985251 (D. Mass. Sept. 14, 2023)................................15

*Leibovitz v. Paramount Pictures Corp.*,
137 F.3d 109 (2d Cir. 1998)..................................................................................................14

*Lombardo v. Dr. Seuss Enters.*,
279 F. Supp. 3d 497 (S.D.N.Y. 2017), *aff'd*, 729 F. App'x 131 (2d Cir. 2018)......................9

*Monsarrat v. Newman*,
28 F.4th 314 (1st Cir. 2022)..................................................................................................15

*N. Jersey Media Grp. Inc. v. Pirro*,
74 F. Supp. 3d 605 (S.D.N.Y. 2015)......................................................................................18

*Nielsen Co. (U.S.), LLC v. Success Sys., Inc.*,
112 F. Supp. 3d 83 (S.D.N.Y. 2015)................................................................................22, 23

*Nunez v. Caribbean Int'l News Corp.*,
235 F.3d 18 (1st Cir. 2000)....................................................................................................19

*NXIVM Corp. v. Ross Inst.*,
364 F.3d 471 (2d Cir. 2004)....................................................................................10, 14, 15, 20

*Otto v. Hearst Commc'ns, Inc.*,
345 F. Supp. 3d 412 (S.D.N.Y. 2018)....................................................................................18

*Raskin v. Swann*,
454 S.E.2d 809 (Ga. Ct. App. 1995)......................................................................................23

*Ramirez v. Time, Inc.*, 12 Media L. Rep. (BNA) 2230 (Sup. Ct. N.Y. Cnty. 1986),
*aff'd*, 134 A.D.2d 970 (1st Dep't 1987)..................................................................................23

iv

*Schneider v. Pearson Educ., Inc.*,
  No. 12 Civ. 6392(JPO), 2013 WL 1386968 (S.D.N.Y. Apr. 5, 2013)....................................21

*Schwartzwald v. Oath Inc.*,
  No. 19-CV-9938 (RA), 2020 WL 5441291 (S.D.N.Y. Sept. 10, 2020) ...................................9

*Semerdjian v. McDougal Littell*,
  No. 07 Civ. 7496(LMM), 2008 WL 110942 (S.D.N.Y. Jan. 2, 2008)....................................22

*Sketchworks Indus. Strength Comedy, Inc. v. Jacobs*,
  No. 19-CV-7470-LTS-VF, 2022 WL 1501024 (S.D.N.Y. May 12, 2022) ...........................20

*Sohm v. Scholastic Inc.*,
  959 F.3d 39 (2d Cir. 2020)...................................................................................................24

*Stanacard, LLC v. Rubard, LLC*,
  No. 12 Civ. 5176, 2016 WL 462508 (S.D.N.Y. Feb. 3, 2016) ..............................................25

*Sundeman v. Seajay Soc'y, Inc.*,
  142 F.3d 194 (4th Cir. 1998) ...............................................................................................20

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
  861 F. Supp. 2d 336 (S.D.N.Y. 2012), *aff'd*, 756 F.3d 73 (2d Cir. 2014) .............................16

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
  756 F.3d 73 (2d Cir. 2014)............................................................................................. *passim*

*Sylo Supply, Inc. v. Juzihao Res. Mgmt. Co.*,
  No. 20-CV-5633 (EK)(MMH), 2023 WL 6370863 (E.D.N.Y. Sept. 28, 2023),
  *adopted*, 2023 WL 6845865 (E.D.N.Y. Oct. 17, 2023)..........................................................17

*TCA Television Corp. v. McCollum*,
  839 F.3d 168 (2d Cir. 2016)...................................................................................................8

*United States v. Devolder Santos*,
  No. 2:23-cr-00197-JS-AYS (E.D.N.Y. Oct. 10, 2023)...........................................................2

*Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*,
  924 F.3d 32 (2d Cir. 2019)....................................................................................................24

*Walsh v. Townsquare Media, Inc.*,
  464 F. Supp. 3d 570 (S.D.N.Y. 2020).....................................................................................9

*Warren v. John Wiley & Sons, Inc.*,
  952 F. Supp. 2d 610 (S.D.N.Y. 2013)...................................................................................22

*Wilder v. Hoiland*,
  No. 22-cv-1254 (PKC), 2024 WL 382141 (S.D.N.Y. Feb. 1, 2024) ......................................15

*Yang v. Mic Network, Inc.*,
  405 F. Supp. 3d 537 (S.D.N.Y. 2019), *aff'd*, No. 20-4097-CV, 2022 WL
  906513 (2d Cir. Mar. 29, 2022) ...............................................................9, 16, 19

*Yang v. Mic Network Inc.*,
  No. 20-4097-CV, 2022 WL 906513 (2d Cir. Mar. 29, 2022).............................12, 15

*Yout, LLC v. Recording Indus. Ass'n of Am., Inc.*,
  633 F. Supp. 3d 650 (D. Conn. 2022) .................................................................3

**Statutes and Rules**

17 U.S.C.
  § 102 ..............................................................................................................24
  § 106 ..............................................................................................................24
  § 107 ................................................................................................... *passim*
  § 201 ..............................................................................................................18

Fed. R. Civ. P. 12 ..............................................................................................1, 9

**Other Authorities**

Bess Levin, *George Santos Is Making a Ridiculous Amount of Money on Cameo*,
  VANITY FAIR (Dec. 6, 2023),
  https://www.vanityfair.com/news/2023/12/george-santos-cameo-earnings ............5

Cameo, TIKTOK (Dec. 6, 2023),
  https://www.tiktok.com/@cameo/video/7309503020906056991 ............................5

George Santos (@MrSantosNY), TWITTER (Dec. 4, 2023, 4:51 PM),
  https://twitter.com/MrSantosNY/status/1731793391992643992 ...........................5

*George Santos Cashing in on Cameo...After Congress Expulsion*, TMZ (Dec. 4,
  2023), https://www.tmz.com/2023/12/04/george-santos-joins-cameo-after-
  expelled-congress/ .................................................................................................5

Gloria Oladipo, *George Santos Reportedly Making Six Figures by Selling Cameo
  Videos: Disgraced Lawmaker Generating More Income Making Personalized
  Videos than Previous Salary as US Congressman*, THE GUARDIAN (Dec. 6,
  2023), https://www.theguardian.com/us-news/2023/dec/06/george-santos-
  cameo-income-salary .............................................................................................5

H.R. Res. 878, 118th Cong. (Dec. 1, 2023) ............................................................2

Marcia Kramer, *Former Rep. George Santos Says He Makes More Money from
  Cameo than He Did in Congress*, CBS NEWS (Dec. 10, 2023),
  https://www.cbsnews.com/newyork/news/george-santos-cameo-income-
  congress-the-point-with-marcia-kramer/ ...............................................................5

Olivia Craighead, *Everyone Wants a George Santos Cameo for Christmas, Apparently*, N.Y. MAG.: THE CUT (Dec. 4, 2023), https://www.thecut.com/2023/12/george-santos-has-joined-cameo.html ...............................5

Press Release, *Congressman George Santos Charged with Conspiracy, Wire Fraud, False Statements, Falsification of Records, Aggravated Identity Theft, and Credit Card Fraud*, U.S. ATTORNEY'S OFF., E.D.N.Y. (Oct. 10, 2023), https://www.justice.gov/usao-edny/pr/congressman-george-santos-charged-conspiracy-wire-fraud-false-statements-0..........................................................................21

Ross Anderson, *George Santos Is Demanding $20,000 from Jimmy Kimmel for Cameos*, THE SPECTATOR (Dec. 11, 2023), https://thespectator.com/topic/george-santos-cameo-jimmy-kimmel-demanding-20000/ ................................................................................................7

Shakira Crístal (@planejanesnewleaf), TIKTOK (Dec. 6, 2023), https://www.tiktok.com/@planejanesnewleaf/video/7309703392790459679 .........................5

Defendants respectfully submit this memorandum of law in support of their motion to dismiss the Complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

This case presents a paradigmatic example of a protected fair use. Plaintiff George Santos, describing himself as "a public figure known for his career in politics and finance" (Compl. ¶ 5), is suing Defendants for copyright infringement and related state-law claims. The case arises out of Santos' latest foray into "finance": making videos through the celebrity video-sharing platform Cameo in exchange for money. Santos' decision to exploit his public notoriety by joining Cameo, just three days after he was expelled from Congress for gross financial misconduct, generated an immediate wave of public discussion. Even before the television segments at issue here aired, the videos he began making available on his Cameo profile page were the subject of extensive public scrutiny, criticism, and mockery.

In this context, late-night talk show host Jimmy Kimmel (host of *Jimmy Kimmel Live!* ("JKL")) decided to test whether, even after being expelled and indicted, there was *anything* Santos would decline to publicly say in exchange for a few hundred dollars. According to the Complaint, under pseudonyms, Kimmel requested over a dozen videos from Santos – each containing increasingly absurd messages. When Santos enthusiastically fulfilled each request, JKL aired two segments that included a handful of the videos within them. They showed Santos delivering messages congratulating friends or family of the requesters on things like successfully cloning their pet schnauzer "Adolf," and "coming out as a 'furry,'" with the "fursona" of a "beav-a-pus" (combination of beaver and platypus). The JKL segments also showed a news clip of Santos boasting about how much money he was supposedly making through Cameo, and, in the second segment, Kimmel commented on the irony that Santos had reportedly threatened to sue him for fraud over these videos.

Count I of the Complaint alleges that by using the videos on commercial television, Defendants exceeded the scope of licensing restrictions on Cameo videos and therefore committed copyright infringement.  That claim fails as a matter of law.  The JKL segments were political commentary on, and criticism of, video clips created and disseminated by a major public figure.  That is a classic fair use.  And the state-law claims fail because, at bottom, they are attempts at a second bite at the apple of the copyright claim.  The contract and unjust-enrichment claims are preempted by the Copyright Act.  And the fraud claim fails because Santos does not plausibly allege the required element of out-of-pocket pecuniary loss – to the contrary, he is about $5,000 richer for having made these videos.  Rather, the "damage" he claims is synonymous with his copyright claim, which is not actionable under state law.

Defendants respectfully request that the Court dismiss the Complaint, with prejudice.

## FACTUAL ALLEGATIONS

### A.    The Parties

Santos is a former member of Congress who is under indictment for multiple counts of fraud and theft.  *See* Superseding Indictment, *United States v. Devolder Santos*, No. 2:23-cr-00197-JS-AYS, ECF No. 50 (E.D.N.Y. Oct. 10, 2023); H.R. Res. 878, 118th Cong. (Dec. 1, 2023).  Within days of his expulsion from Congress, Santos turned to Cameo, an online platform through which he creates personalized videos in exchange for money.  Compl. ¶ 13.

Kimmel is the host of *Jimmy Kimmel Live!* ("JKL"), a late-night talk show on ABC.  *Id.* ¶¶ 6–8.  Each show opens with a monologue in which Kimmel often comments on and pokes fun at current events, public figures, and politicians.

### B.    Cameo Videos

Cameo is an online platform "where celebrities and public figures ... connect with their fans through personalized video messages."  Compl. ¶ 1.  Through Cameo, anyone ("Users") can

send a request to celebrities ("Talent") containing a message that they would like the celebrity to deliver.  *Id.* ¶¶ 13, 15.  Users pay a fee to Cameo, and Cameo shares the fee with the Talent.  *See* Site Terms of Service § 7(c), (e); Talent Terms of Service § 4(b).[1]  If the Talent accepts the request, the Talent records a short video with the requested message and uploads it to Cameo. Talent Terms of Service § 2(a).  Cameo then sends it along to the User.  In addition, as explained below, both the Talent and Cameo may also make broad use of the same video.

### 1.    Users and Cameo Videos

The relationship between Cameo and Users is governed by Cameo's Site Terms of Service, which also incorporate Cameo's Acceptable Use Policy and Community Guidelines. Pursuant to those Site Terms, Users agree that Cameo videos are owned by the Talent.  Site Terms of Service § 8(a).  As is relevant here, the Terms further provide that the Talent grants the User a license to use the video "in any and all media" "solely for ... personal, non-commercial, and non-promotional purposes."  *Id.* § 2(d).  What the Complaint characterizes as this "personal use" license is what was allegedly obtained and purchased by Defendants.  Compl. ¶ 22.[2]

The Community Guidelines address when and how Cameo may seek to enforce any violation of its Terms of Service, including, but not limited to, by removing content from the site.

---

[1] On this motion to dismiss, the Court may consider Cameo's Terms of Service because they are judicially noticeable and incorporated by reference into the Complaint.  *See* Compl. ¶¶ 14–15, 18, 58; *Bus. Casual Holdings, LLC v. YouTube, LLC*, No. 21-CV-3610 (JGK), 2022 WL 837596, at *1 n.2 (S.D.N.Y. Mar. 21, 2022) (considering website's terms of service because they were subject to judicial notice and were integral to and expressly referenced in the complaint); *Yout, LLC v. Recording Indus. Ass'n of Am., Inc.*, 633 F. Supp. 3d 650, 666–67 (D. Conn. 2022) (taking judicial notice of website's terms of service to understand site's technology).  For the convenience of the Court, a copy of Cameo's Terms of Service (in effect as of the time the Videos were created and used) is attached as Exhibit 1 to the Declaration of Nathan Siegel (Site Terms of Service at pp.1–9; Talent Terms of Service at pp.20–31).  The Terms of Service also include Cameo's Community Guidelines, which are attached as Exhibit 2 to the Siegel Declaration.

[2] Cameo also offers a separate "Business" license which may be used for certain promotional purposes. Site Terms of Service § 3.  That type of license could not apply here and is not at issue.  *See* Compl. ¶ 16.

Notably, the Guidelines provide that "[i]n limited circumstances, we may, in our sole discretion, allow exceptions to our content removal policies when we determine the material serves the public interest, such as content that is clearly satirical, scientific, or educational in nature." Community Guidelines § B.  The Complaint does not allege that Cameo has initiated or threatened any action against Defendants in connection with this dispute.

### 2.    Talent and Cameo Videos

The relationship between Talent and Cameo is governed solely by the "Talent Terms of Service," which also incorporate the Community Guidelines and Acceptable Use Policy.

In addition to the license that the Talent agrees to grant to Users (Talent Terms of Service § 6(b)(i)), the Talent may also publicly display the Cameo videos they create on Cameo's site. *Id.* § 6(a).  Moreover, the Talent grants Cameo a very broad license to use the videos for Cameo's promotional purposes.  *Id.* (granting an "unlimited, universal, sublicensable ... , perpetual, and irrevocable license in any and all manner and media").

### C.    Public Scrutiny of Santos' Resort to Making Cameo Videos

In early December 2023, Santos' decision to sell videos on Cameo generated significant public controversy and discussion.[3]  In an interview with CBS, Santos boasted that "by the end of this week – that is actually factual – I will have made more money in seven days than I

---

[3] The Court may take judicial notice of "the fact of the publication of" "news articles" and public commentary, not for their substantive truth, but rather to understand the "media frenzy" and to place the use of Santos' Videos "in the broader social context."  *Condit v. Dunne*, 317 F. Supp. 2d 344, 357–58 (S.D.N.Y. 2004); *see also Hughes v. Benjamin*, 437 F. Supp. 3d 382, 391 & n.4 (S.D.N.Y. 2020) (taking judicial notice of news articles to show that defendant's fair use had "pejorative meaning in this context"); *Boesen v. United Sports Publ'ns, Ltd.*, No. 20-CV-1552 (ARR) (SIL), 2020 WL 6393010, at *5 & n.6 (E.D.N.Y. Nov. 2, 2020) (taking judicial notice of social media posts to show that work was published).

would've made in an entire year in Congress."[4]  Santos' Cameo videos generated widespread

publicity, much of it negative, before any of the Videos at issue here were aired.[5]

     For example, U.S. Senator John Fetterman ridiculed Santos by soliciting from him a

Cameo video ostensibly "to give 'Bobby from Jersey' some advice" with his "legal problems."

Fetterman then posted the Cameo video on Twitter (a/k/a X) as if it were directed at advising the

"ethically-challenged" Senator Robert Menendez.[6]  In fact, likely because Cameo permits Santos

to publicly display his videos on his Cameo profile, both the media and others began to notice

and repost Santos' Cameo videos,[7] including some of the Videos at issue in this case, several

days *before* they were ever broadcast on television.[8]

---

[4] Marcia Kramer, *Former Rep. George Santos Says He Makes More Money from Cameo than He Did in Congress*, CBS NEWS (Dec. 10, 2023), https://www.cbsnews.com/newyork/news/george-santos-cameo-income-congress-the-point-with-marcia-kramer/ (copy attached as Siegel Decl. Ex. 3).

[5] *E.g.*, Bess Levin, *George Santos Is Making a Ridiculous Amount of Money on Cameo*, VANITY FAIR (Dec. 6, 2023), https://www.vanityfair.com/news/2023/12/george-santos-cameo-earnings (copy attached as Siegel Decl. Ex. 4); Gloria Oladipo, *George Santos Reportedly Making Six Figures by Selling Cameo Videos: Disgraced Lawmaker Generating More Income Making Personalized Videos than Previous Salary as US Congressman*, THE GUARDIAN (Dec. 6, 2023), https://www.theguardian.com/us-news/2023/dec/06/george-santos-cameo-income-salary (copy attached as Siegel Decl. Ex. 5); *George Santos Cashing in on Cameo...After Congress Expulsion*, TMZ (Dec. 4, 2023), https://www.tmz.com/2023/12/04/george-santos-joins-cameo-after-expelled-congress/ (copy attached as Siegel Decl. Ex. 6).

[6] Santos replied that he did not know "the Bobby in question" was actually Senator Bob Menendez, adding "LOL" and a laughing emoji.  George Santos (@MrSantosNY), TWITTER (Dec. 4, 2023, 4:51 PM), https://twitter.com/MrSantosNY/status/1731793391992643992 (copy attached as Siegel Decl. Ex. 7).

[7] *E.g.*, Cameo, TIKTOK (Dec. 6, 2023), https://www.tiktok.com/@cameo/video/7309503020906056991 (Santos' videos were "not on our 2023 bingo card") (copy attached as Siegel Decl. Ex. 8); Olivia Craighead, *Everyone Wants a George Santos Cameo for Christmas, Apparently*, N.Y. MAG.: THE CUT (Dec. 4, 2023), https://www.thecut.com/2023/12/george-santos-has-joined-cameo.html (displaying Santos' videos reposted on TikTok accounts @georgiescameos and @jackbowers01) (copy attached as Siegel Decl. Ex. 9).

[8] *E.g.*, Shakira Crístal (@planejanesnewleaf), TIKTOK (Dec. 6, 2023), https://www.tiktok.com/@planejanesnewleaf/video/7309703932790459679 (reposting Santos' video on the "beloved schnauzer Adolf") (copy attached as Siegel Decl. Ex. 10).

### D.      Kimmel's Critique of Santos' Cameo Videos

The Complaint alleges that Kimmel, using fake names, solicited 14 videos from Santos, and Santos fulfilled all of them by "[r]elying" on the requests (the "Videos").  Compl. ¶¶ 20–21. They included:

- A request that Santos express support for a friend who "just came out as a Furry" called a "Beav-a-pus," which is "a platypus mixed with a beaver."  The request also asks Santos to do a loud "Yiff yiff yiff," which is "the sound Beav-a-pus makes."  *Id.* ¶ 56(e).

- A request that Santos congratulate a "legally blind" niece for "passing her driving test," and wish her a speedy recovery after her "really bad car accident" from which she is recovering "with help from Jesus and President Trump."  *Id.* ¶ 56(d).

- A request that Santos congratulate a mother for "the successful cloning of her beloved schnauzer Adolf" after going "through a lot of dogs in the trial run."  *Id.* ¶ 56(b).

- A request that Santos implore the requester's wife to call him because he hasn't seen the kids since he "burned down the shed shooting off fireworks," but he wants the "family together on Christmas or if not that Valentimes [sic] Day or Flag [sic]."  *Id.* ¶ 56(c).

- A request that Santos congratulate a friend for winning the "Clearwater Florida Beef Eating Contest" by eating "almost 6 pounds of loose ground beef in under 30 minutes." *Id.* ¶ 56(a).

On December 7, during his opening monologue on JKL, Kimmel discussed "disgraced former Congressman George Santos, who has a new gig making videos on Cameo."  *Id.* ¶ 25; Siegel Decl. Ex. 11.[9]  Kimmel explained that he sent Santos "a number of different ridiculous

---

[9] Because Defendants' two broadcasts are "referred to in the complaint" and are "integral" to Plaintiff's claims, they are "deemed incorporated into the complaint by reference" and can be considered on this motion to dismiss.  *Gottlieb Dev. LLC v. Paramount Pictures Corp.*, 590 F. Supp. 2d 625, 630 n.1 (S.D.N.Y. 2008).  Accordingly, the relevant portion of the December 7 broadcast of JKL is attached as

requests" because he wanted to "find out: Will Santos Say It?"  Kimmel then read the verbatim

text of three of the requests aloud (which Defendants had written) and each time asked the

audience, "Will Santos Say It?"  Each time, the audience, roaring with laughter, learned the

answer was "Yes."  Kimmel played the corresponding Video, in which Santos enthusiastically

read the request nearly verbatim in a selfie-style video, each of which was approximately 20–45

seconds long.  After playing each Video, Kimmel interjected additional mocking commentary,

such as his imitation of Santos blowing a kiss to the dog "Adolf."

On December 11, a publication called *The Spectator* published an article about Kimmel's

monologue and included comments from Santos.[10]  According to the article, Santos claimed that

Kimmel owed him an additional $21,800 for commercial broadcast use of the three videos and

threatened to sue him.  Santos also claimed that he had in fact rejected over 60 video requests

based on his "guiding [moral] compass."

That night, Kimmel aired another opening monologue.  This time, it began with an

excerpt from the CBS interview with Santos where the reporter noted that Santos "found a new

career on Cameo" "within four seconds of leaving office" and asked him incredulously, "What is

that about?"  Siegel Decl. Ex. 12.  Kimmel then noted Santos' boast about how much money he

was making and said that he sent Santos "a bunch of crazy video requests" because he "wanted

to see what he would read and what he wouldn't read."  *Id.*; Compl. ¶ 27.  Kimmel then

---

Exhibit 11 to the Siegel Declaration and is also available at
https://www.youtube.com/watch?v=iyoRHDkJKlo&t=413s.  The relevant portion of the December 11
broadcast of JKL is attached as Exhibit 12 to the Siegel Declaration and is also available at
https://www.youtube.com/watch?v=5-4SUO4Rlik&t=410s.

[10] Ross Anderson, *George Santos Is Demanding $20,000 from Jimmy Kimmel for Cameos*, THE
SPECTATOR (Dec. 11, 2023), https://thespectator.com/topic/george-santos-cameo-jimmy-kimmel-
demanding-20000/ (copy attached as Siegel Decl. Ex. 13).

displayed the headline of the *Spectator* article published earlier that day and commented, "Could you imagine if I get sued by George Santos for fraud? ... It would be like a dream come true."

Asking "Will Santos Say It?", Kimmel proceeded to read two requests that were even more ridiculous than the ones he read a few nights earlier. Once again, Santos enthusiastically repeated the requests nearly word for word. Emphasizing the absurdity of the Videos, Kimmel then repeated the "yiff yiff yiff" "beav-a-pus" call.

### E.     The Complaint

Count 1 of the Complaint alleges that the Defendants infringed Santos' copyright in the five Videos that were aired on television. Compl. ¶¶ 33–53. Count II alleges a claim for fraudulent inducement premised on all fourteen Videos that Kimmel allegedly solicited. *Id.* ¶¶ 54–59. Count III asserts a claim for breach of contract, alleging that airing the five Videos and posting them online for commercial purposes breached the terms of the "personal use license agreement." *Id.* ¶¶ 60–64. Count IV alleges a claim for unjust enrichment. *Id.* ¶¶ 65–67.

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, a complaint must "contain enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible only if the plaintiff pleads "factual content" that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"; "facts that are 'merely consistent with' a defendant's liability ... 'stop[] short of'" meeting this threshold. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

Although an affirmative defense to copyright infringement, the issue of fair use may be resolved on a motion to dismiss where the defense is "clearly established" by the complaint and a side-by-side comparison of the works at issue. *TCA Television Corp. v. McCollum*, 839 F.3d 168, 178 (2d Cir. 2016); *see also Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73,

86 (2d Cir. 2014); *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013) ("Affirmative

defenses [including fair use of a trademark] may be adjudicated at" a motion to dismiss "where

the facts necessary to establish the defense are evident on the face of the complaint.").  In

rebutting a fair-use defense, plaintiffs are held to "the usual burden of a motion to dismiss ...

which is to say they must plead sufficient facts to plausibly suggest that they are entitled to

relief."  *Kelly-Brown*, 717 F.3d at 308.  In light of these principles, district courts regularly grant,

and the Second Circuit has frequently affirmed, motions to dismiss a complaint under Fed. R.

Civ. P. 12(b)(6) or 12(c) on the grounds of fair use.[11]

## ARGUMENT

## I.     SANTOS' COPYRIGHT CLAIM IS BARRED BY THE FAIR USE DOCTRINE

Santos alleges that Defendants committed copyright infringement by exceeding the scope

of an alleged personal use license.  That claim fails because Kimmel's use of the Videos to

comment on and mock a controversial political figure to a broad audience was the quintessential

example of a fair use.

Section 107 of the Copyright Act lists four non-exclusive factors to consider in

determining whether a particular use of a copyrighted work is a fair use:

> (1) the purpose and character of the use, including whether such use is of a
> commercial nature or is for nonprofit educational purposes;

> (2) the nature of the copyrighted work;

---

[11] *See, e.g.*, *Brody v. Fox Broad. Co.*, No. 22cv6249 (DLC), 2023 WL 2758730, at *2 (S.D.N.Y. Apr. 3, 2023) (Cote, J.); *Yang v. Mic Network, Inc.*, 405 F. Supp. 3d 537, 542 (S.D.N.Y. 2019), *aff'd*, No. 20-4097-CV, 2022 WL 906513 (2d Cir. Mar. 29, 2022); *Lombardo v. Dr. Seuss Enters.*, 279 F. Supp. 3d 497, 504–05 (S.D.N.Y. 2017), *aff'd*, 729 F. App'x 131 (2d Cir. 2018); *Hughes v. Benjamin*, 437 F. Supp. 3d 382, 394 (S.D.N.Y. 2020); *Walsh v. Townsquare Media, Inc.*, 464 F. Supp. 3d 570, 586 (S.D.N.Y. 2020); *Harbus v. Manhattan Inst. for Pol'y Res.*, No. 19 Civ. 6124 (ER), 2020 WL 1990866, at *9 (S.D.N.Y. Apr. 27, 2020); *Schwartzwald v. Oath Inc.*, No. 19-CV-9938 (RA), 2020 WL 5441291, at *1 (S.D.N.Y. Sept. 10, 2020); *Clark v. Transp. Alts., Inc.*, No. 18 Civ. 9985 (VM), 2019 WL 1448448, at *5 (S.D.N.Y. Mar. 18, 2019); *Adjmi v. DLT Ent. Ltd.*, 97 F. Supp. 3d 512, 527–28 (S.D.N.Y. 2015); *Arrow Prods., Ltd. v. Weinstein Co.*, 44 F. Supp. 3d 359, 368 (S.D.N.Y. 2014).

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.  The four factors must be considered together, and none may be "treated in isolation."  *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith* ("*Warhol*"), 598 U.S. 508, 528 (2023) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994)).  Moreover, "[a]lthough defendants bear the burden of proving that their use was fair, they need not establish that each of the factors set forth in § 107 weighs in their favor."  *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 476–77 (2d Cir. 2004).

Here, a weighing of the factors establishes as a matter of law that Defendants' airing of the Videos within the context of critical segments on JKL constituted a protected fair use.

A.      The Purpose and Character of the Use Was Highly Transformative

The first factor weighs strongly in favor of fair use and, nearly alone, decides the case. For this factor, the statute instructs the Court to assess "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1).  At the outset, courts have recognized a "strong presumption" that the first-factor analysis "tilt[s] in the defendants' favor" where the secondary work falls within one or more of the uses described in the preamble to § 107: "criticism, comment, news reporting, ... scholarship, or research."  *NXIVM*, 364 F.3d at 476–77.  The use here was squarely for purposes of criticism and comment.

Even more importantly, the Supreme Court recently revisited the first factor in *Warhol*. Its analysis makes clear why this case involves an archetypical fair use.  As the Court explained, "[t]his factor considers the reasons for, and nature of, the copier's use of an original work," with the "'central' question" being "whether the new work merely 'supersede[s] the objects' of the

10

original creation ... or instead adds something new, with a further purpose or different

character."  *Warhol*, 598 U.S. at 527–28 (quoting *Campbell*, 510 U.S. at 579).  "A use that has a

further purpose or different character is said to be 'transformative.'"  *Id.* at 529.

As *Warhol* emphasized, "[c]riticism of a work, for instance, ordinarily does not supersede

the objects of, or supplant, the work.  Rather, it uses the work to serve a distinct end."  *Id.* at 528;

*see also id.* at 532 ("[C]ommentary or criticism that targets an original work may have

compelling reason to 'conjure up' the original by borrowing from it.").  The Second Circuit has

long construed the first factor the same way.  *See, e.g.*, *Authors Guild v. Google, Inc.*, 804 F.3d

202, 215–16 (2d Cir. 2015) ("[C]opying from an original for the purpose of criticism or

commentary on the original or provision of information about it, tends most clearly to satisfy

*Campbell*'s notion of the 'transformative' purpose involved in the analysis of Factor One.").

Thus, "faithfully reproduc[ing] an original work without alteration" can be transformative in

light of the "altered purpose or context of the work, as evidenced by surrounding commentary or

criticism."  *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 84 (2d Cir. 2014)

(holding that publication of full audio recording of plaintiff company's investor phone call was

transformative fair use).

Consistent with these principles, in *Kane v. Comedy Partners*, when the satirical,

comedic TV program *The Daily Show* used a video clip from the plaintiff's public access show

in a segment that mocked public access shows (in a segment called "Public Excess"), that was

considered protected fair use.  *Kane v. Comedy Partners*, No. 00 Civ. 158(GBD), 2003 WL

22383387, at *4 (S.D.N.Y. Oct. 16, 2003), *aff'd*, 98 F. App'x 73, 73–74 (2d Cir. 2004)

(affirming "[f]or substantially the reasons set forth by the district court in its thorough and well-

reasoned opinion").  As the district court explained, ridiculing someone else's work – be it in the

form of parody (which alters the original work) or mocking commentary (which, both here and in *Kane*, preserves the original work) – is likely a fair use because both "*comment*[] on [the prior] author's works" using "the element of ridicule."  2003 WL 22383387, at *4.  When the *Daily Show* incorporated the plaintiff's clip into a segment containing a "succession of other public access clips," "accompanied by" the host's "derisive," "smirking commentary," the court found the "critical nature of the use" readily apparent.  *Id.*

Likewise, in *Hughes v. Benjamin*, the court readily granted a motion to dismiss an infringement claim over the defendant's posting of a video consisting entirely of unaltered clips from a YouTube video created by the plaintiff, with a derisive title mocking plaintiff's politics and purported lack of self-awareness.  *Hughes v. Benjamin*, 437 F. Supp. 3d 382, 391 (S.D.N.Y. 2020).  The court held that it was "clear from the face of [the] Complaint that [the defendant] copied portions of [the plaintiff's video] for the transformative purposes of criticism and commentary."  *Id.*; *see also Yang v. Mic Network Inc.*, No. 20-4097-CV, 2022 WL 906513, at *2 (2d Cir. Mar. 29, 2022) (affirming dismissal of infringement claim from use of plaintiff's photo that had appeared on the cover of the *New York Post* because the defendant was using the image "to cover the public's lampooning of the Post article and provide [the defendant's] own commentary" on and "criticism of the Post article"); *Hosseinzadeh v. Klein*, 276 F. Supp. 3d 34, 39–40 (S.D.N.Y. 2017) (expressing "no doubt" that YouTube video containing clips of plaintiff's video interspersed with "mockery," "criticism and commentary" on plaintiff's video was fair use).

The same analysis applies here.  The Videos were shown on both JKL segments as a means of mocking and criticizing Santos' decision to immediately pivot from being expelled from Congress for financial misconduct to a "new gig" selling Cameo videos, in a manner that

suggested he still had no shame about doing anything for money.  The thrust of the first segment was to see whether Santos would be willing to say patently ridiculous things that could be posted on the Internet in exchange for several hundred dollars.  Each Video was introduced by Kimmel first reading out loud the "ridiculous request[]" sent to Santos, followed by the question: "Will Santos Say It?"  In addition, the second segment further mocked Santos by making the point that no matter how ridiculous a Video might be, Santos had no shame about demanding even more money and threatening lawsuits.

In this regard, JKL's use of the Videos is analogous to Andy Warhol's famous Campbell's "Soup Cans" series of screen-prints, which the Supreme Court recently analyzed in *Warhol*.  As the Court noted, "[t]he purpose of Campbell's logo is to advertise soup.  Warhol's canvases do not share that purpose.  Rather, the Soup Cans series uses Campbell's copyrighted work for an artistic commentary on consumerism, a purpose that is orthogonal to advertising soup." *Warhol*, 598 U.S. at 539.  The Court explained further that:

> [Warhol's] Soup Cans series targets the logo. That is, the original copyrighted
> work is, at least in part, the object of Warhol's commentary. It is the very nature
> of Campbell's copyrighted logo—well known to the public, designed to be
> reproduced, and a symbol of an everyday item for mass consumption—that
> enables the commentary. Hence, the use of the copyrighted work not only serves a
> completely different purpose, to comment on consumerism rather than to
> advertise soup, it also "conjures up" the original work to "she[d] light" on the
> work itself, not just the subject of the work.

*Id.* at 539–40.

Here too, the Videos are the "target[]" of the criticism and commentary conveyed by the "Will Santos Say It?" segments.  The "purpose" of using the Videos – to mock the shameless willingness of a former Congressman to make internet videos saying the absurd things requested of him while under indictment for theft and fraud – is "completely different" from Santos' ostensible purpose in creating the Videos to congratulate or otherwise communicate with the

requester's friends or family.  Indeed, the Supreme Court has recognized that biting – even offensive – mockery of public officials through "exploitation of ... politically embarrassing events" has long "played a prominent role in public and political debate."  *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 54 (1988).  In short, the use of the Videos was for a specifically enumerated statutory purpose of criticism and comment and was highly transformative.

The transformative nature of the use here also strongly outweighs the fact that JKL airs on commercial television.  As *Warhol* reiterated, "[t]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use."  *Warhol*, 598 U.S. at 531 (quoting *Campbell*, 510 U.S. at 579).  As the Court has also observed, "nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research, ... are generally conducted for profit in this country," so placing excessive importance on commerciality would "swallow" the efficacy of fair use entirely.  *Campbell*, 510 U.S. at 584. Thus, the Second Circuit has "repeatedly rejected the contention that commercial motivation should outweigh a convincing transformative purpose and absence of significant substitutive competition with the original," and has not hesitated to find fair use in cases involving defendants that publish or broadcast content for profit.  *Authors Guild*, 804 F.3d at 219; *see, e.g.*, *Swatch*, 756 F.3d at 83 (giving "little weight" to fact that defendant is an "undisputed[ly] ... commercial enterprise" and that allegedly infringing content was published on a "subscription service available to paying users"); *Blanch v. Koons*, 467 F.3d 244, 253–54 (2d Cir. 2006) ("discount[ing]" commerciality because use was "substantially transformative"); *NXIVM*, 364 F.3d at 478 (where new work was "substantially transformative, the district court properly discounted the secondary commercial nature of the use"); *Leibovitz v. Paramount Pictures*

14

*Corp.*, 137 F.3d 109, 115 (2d Cir. 1998) (holding that the "strong parodic nature" of movie poster "tips the first factor significantly toward fair use, even after making some discount for the fact that it promotes a commercial product").

Finally, the Complaint seems to imply that Defendants acted in bad faith because Santos was allegedly misled about the identity of the individuals requesting the Videos and their intended uses.  If so, that argument fails to move the needle for two reasons.  First, alleged bad faith plays little, if any, role in the fair use analysis.  Second, even if that were not so, the Complaint does not and cannot allege the kind of "bad faith" that might influence the analysis.

In *NXIVM*, the Second Circuit held that "while the good or bad faith of a defendant generally should be considered, it generally contributes little to fair use analysis."  *NXIVM*, 364 F.3d at 479 n.2.  In that case, the Court held that the fact that the defendant journalists knew their source had violated a non-disclosure agreement to provide them with the plaintiff's publications was of minimal relevance to the first-factor analysis, "in light of the transformative nature of the secondary use as criticism" of those publications.  *Id.* at 479.  Cases since *NXIVM* have consistently reached the same conclusion.[12]  Indeed, in a recent decision, "the Supreme Court ... cast doubt on 'whether bad faith has any role in a fair use analysis.'"  *Wilder v. Hoiland*, No. 22-cv-1254 (PKC), 2024 WL 382141, at *17 n.21 (S.D.N.Y. Feb. 1, 2024) (quoting *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 32 (2021)).

Moreover, even if a defendant's "bad faith" were relevant to the analysis at all, Santos has not plausibly alleged the kind of actual bad faith that courts have occasionally found to be relevant, such as physically removing something crediting the work to the plaintiff to conceal its

---

[12] *See also Yang v. Mic Network Inc.*, No. 20-4097-CV, 2022 WL 906513, at *2 (2d Cir. Mar. 29, 2022); *Monsarrat v. Newman*, 28 F.4th 314, 322–23 (1st Cir. 2022); *Larson v. Dorland*, No. 1:19-CV-10203-IT, 2023 WL 5985251, at *14 (D. Mass. Sept. 14, 2023); *Fioranelli v. CBS Broad. Inc.*, 551 F. Supp. 3d 199, 242–43 (S.D.N.Y. 2021).

true ownership.  *See, e.g.*, *Yang*, 405 F. Supp. 3d at 546 (finding bad faith "suggest[ed]" by defendant's "removing the label crediting the work to Plaintiff" on photograph).  Instead, Santos alleges that Kimmel "misrepresented himself and his motives to induce Plaintiff to create personalized videos for the sole purpose of capitalizing on and ridiculing Plaintiff's gregarious personality."  Compl. ¶ 2.  But multiple cases have held that similar conduct for similar purposes should not be considered bad faith in the fair use context.

For example, in the analogous context of news reporting, the district court in *Swatch* found that allegations that the defendant had "clandestinely" obtained an audio recording did not constitute bad faith.  *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 861 F. Supp. 2d 336, 340–41 (S.D.N.Y. 2012), *aff'd*, 756 F.3d 73 (2d Cir. 2014); *see also Swatch*, 756 F.3d at 83–84 (journalist's knowledge that "its use [of the plaintiff's work] was contrary to [the plaintiff's] instructions" did not constitute bad faith sufficient to affect the fair use analysis).  Likewise, considering facts even more analogous to this case, in *Kane* the court found fair use notwithstanding the allegations that the representative for the *Daily Show* had "misle[d] [the plaintiff] into believing that copyright law did not apply to public access television" in seeking permission to use clips from her program.  *Kane*, 2003 WL 22383387, at *7.  Moreover, even Cameo's Community Guidelines recognize that there may be times when the dissemination of Cameo videos in contravention of its Terms "serve the public interest, such as content that is clearly satirical, scientific, or educational in nature."  Community Guidelines § B.

Finally, the fact that Santos himself independently made these videos publicly available further supports a finding of fair use.  In a decision concerning a motion to quash a subpoena to YouTube, the court held that the defendant's alleged "bad faith" in obtaining copies of the plaintiff's works from another YouTube user "who leaked the ... video prior to its official

release" "deserve[ed] little to no weight," given that the plaintiff "made its works freely available for download and redistribution from its website" and that the defendant's use of the works "was quite plainly critical and transformative." *In re DMCA Section 512(h) Subpoena to YouTube (Google, Inc.)*, 581 F. Supp. 3d 509, 521 (S.D.N.Y. 2022).  The same considerations apply here.

For these reasons, as a matter of law, the first factor strongly weighs in favor of a finding of fair use.

### B. The Nature of the Copyrighted Work Was Minimally Creative and Was Previously Published

The second factor concerns "the nature of the copyrighted work."  § 107(2).  This inquiry turns on "(1) whether the work is expressive or creative, such as a work of fiction, or more factual, with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower." *Blanch*, 467 F.3d at 256.

Taking the second element of the inquiry first, there is no dispute that the Videos had already been published when JKL aired the two segments.  Santos' copyright registrations state they were all published on the same days Santos created them. *See* Compl. ¶ 34; Siegel Decl. Exs. 14–18 (listing publication dates of December 6 and 7, 2023).[13]  Indeed, as previously noted, not only were they published by Santos through Cameo, some of the Videos were reposted multiple times online by others and were the subject of media and social commentary even before JKL aired them. *See supra* note 8 and accompanying text.

---

[13] The Court "may take judicial notice of the copyright registration information set forth in the United States Copyright Office's Public Catalog," including "the dates of first publication" of the works. *Sylo Supply, Inc. v. Juzihao Res. Mgmt. Co.*, No. 20-CV-5633 (EK)(MMH), 2023 WL 6370863, at *6 (E.D.N.Y. Sept. 28, 2023), *adopted*, 2023 WL 6845865 (E.D.N.Y. Oct. 17, 2023).

Next, the first element of the second-factor analysis turns on the reality that "some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586. In assessing this factor, courts look to the "thickness" or "thinness" of the defendant's copyright. *Swatch*, 756 F.3d at 87. Santos' copyright is vanishingly thin.

As the JKL segments make clear in introducing each Video, the text of the Videos was supplied by Defendants; outside of minor asides, Santos did not "write" any of the Videos. *Cf. Kimberley v. Penguin Random House*, No. 17-CV-5107-LTS-KHP, 2018 WL 1918614, at *3 (S.D.N.Y. Apr. 19, 2018) (noting that "verbatim reproduction of the statements of quotations of others" is not "entitled to copyright protection"). And though Santos chose the framing of the Videos and performed them himself, it is apparent that they were created by simply holding up the camera on his smartphone and reading from the script provided to him by Defendants. To the extent that is protectable at all, the scope of the copyright is thin, which weighs in favor of fair use. *See, e.g.*, *Otto v. Hearst Commc'ns, Inc.*, 345 F. Supp. 3d 412, 430 (S.D.N.Y. 2018) (holding that second factor favored fair use where smartphone photograph at party "was spontaneously taken to document its subjects, as they were in the moment"); *N. Jersey Media Grp. Inc. v. Pirro*, 74 F. Supp. 3d 605, 620 (S.D.N.Y. 2015) (collecting cases holding that "photographic works created for news gathering or other non-artistic purposes have found this factor to weigh in favor of fair use"); *see also Google*, 593 U.S. at 29 (finding fair use where plaintiff's work was, "if copyrightable at all, further than are most [such works] from the core of copyright"). In fact, were it not for the Cameo Terms providing that the Talent retains copyright in the videos, Santos' Videos might well qualify as jointly authored works. *See* 17 U.S.C. § 201(a).

C.     The Portion Used Was Integral to the Criticism

The third factor weighs "the amount and substantiality of the portion used in relation to the copyrighted work as a whole."  17 U.S.C. § 107(3).  In looking at the "amount and substantiality," the key to the inquiry is whether "the quantity and value of the materials used are reasonable *in relation to the purpose of the copying*."  *Campbell*, 510 U.S. at 586 (citation omitted) (emphasis added).  In this regard, courts have recognized that use of the plaintiff's entire work "does not necessarily weigh against fair use because copying the entirety of a work is sometimes necessary to make a fair use."  *Swatch*, 756 F.3d at 84, 90 (holding that news organization's use of entirety of investor call was fair because "the need to convey information to the public accurately may in some instances make it desirable and consonant with copyright law for a defendant to faithfully reproduce an original work without alteration").  Importantly, "[t]he law 'does not require that the secondary artist may take no more than is necessary,'" because "[t]he secondary use must be permitted to conjure up *at least* enough of the original to fulfill its transformative purpose."  *Yang*, 405 F. Supp. 3d at 546–47 (citations omitted).

Here, the thrust of the transformative purpose behind using the Videos was to answer the question "Will Santos Say It?" regarding a series of increasingly absurd Cameo requests.  Only by showing the full Video (each of which was quite short) can the viewer appreciate the degree to which Santos absolutely will – without any apparent sense of shame – "say it," every single time.  That comedic and critical purpose would be severely undermined by showing only a truncated snippet of each short Video.  *See Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 24 (1st Cir. 2000) (copying an entire picture was fair where "to copy any less than that would have made the picture useless to the story"); *Yang*, 405 F. Supp. 3d at 546–47 ("If copying the original any less would make the picture useless to the story, the substantiality of the copying is of little consequence." (cleaned up)).

19

**D.     The Use Had No Effect on the Market Because There Is No Viable Market for Critical Broadcast Use of Cameo Videos**

Finally, the Court must consider "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4).  In analyzing the fourth factor, courts look to "whether the secondary use usurps the market of the original work." *NXIVM*, 364 F.3d at 482. Critically, however, this factor is "limit[ed]" to "consideration [of] a use's 'impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets.'" *Swatch*, 756 F.3d at 91 (citation omitted).  This factor also favors fair use as a matter of law because there is no protectible market for copyright owners to license materials for the purpose of being ridiculed.

As the Supreme Court has explained:

> The market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop. Yet the unlikelihood that creators of imaginative works will license critical reviews or lampoons of their own productions removes such uses from the very notion of a potential licensing market.

*Campbell*, 510 U.S. at 592; *see also id.* ("[T]he law recognizes no derivative market for critical works, including parody."); *Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194, 207 (4th Cir. 1998) (holding that "[i]f there were a protectible derivative market for critical works, copyright holders would only license to those who would render favorable comment," but "[t]he copyright holder cannot control the dissemination of criticism"); *Adjmi*, 97 F. Supp. 3d at 534 (explaining that the Supreme Court's "position" in *Campbell* "reflects that there is no protectable derivative market for criticism by acknowledging the reality that, generally speaking, authors of original works rarely want their work to be criticized," and holding that theater work parodying sitcom did not impair market for original); *Sketchworks Indus. Strength Comedy, Inc. v. Jacobs*, No. 19-CV-7470-LTS-VF, 2022 WL 1501024, at *7 (S.D.N.Y. May 12, 2022) (concluding that fourth factor

20

weighed in favor of fair use for play that "mocks and attempts to communicate a critical message about the misogynistic features of [the original Broadway musical] *Grease*").  Accordingly, this factor also weighs in favor of fair use.

## II.    THE FRAUD CLAIM FAILS FOR LACK OF OUT-OF-POCKET LOSS

The tort of fraud is not a vehicle for remedying all allegedly irksome misrepresentations.  Rather, the tort is specifically limited to conduct that divests people of money.  For example, the kind of conduct alleged in the pending indictment against Santos – such as obtaining a donor's credit cards under the pretense of using it solely for a political contribution, then charging $44,800 both for himself and additional contributions under the phony names of others – is a classic example of alleged fraud because the victim actually lost money.[14]

Here, even assuming solely for purposes of this motion that Santos could plead and prove a knowingly false representation of material fact on which he justifiably relied, he does not and cannot plead that "as a result of such reliance [he] suffered pecuniary loss."  *Ithaca Cap. Invs. I S.A. v. Trump Panama Hotel Mgmt. LLC*, 450 F. Supp. 3d 358, 369 (S.D.N.Y. 2020) (quoting *Stephenson v. PricewaterhouseCoopers, LLP*, 482 F. App'x 618, 622 (2d Cir. 2012)); *see also Schneider v. Pearson Educ., Inc.*, No. 12 Civ. 6392(JPO), 2013 WL 1386968, at *5 n.6 (S.D.N.Y. Apr. 5, 2013) ("damages are an essential element of a fraud claim").

Santos pleads only that "[a]s a direct and proximate result of Defendants' fraudulent inducement, Plaintiff has suffered monetary damages."  Compl. ¶ 59.  But he does not allege – nor could he plausibly allege – that he lost a single dollar as a result of the purported "misrepresentations."  To the contrary, due to Santos' supposed reliance on the alleged

---

[14] *See* Press Release, *Congressman George Santos Charged with Conspiracy, Wire Fraud, False Statements, Falsification of Records, Aggravated Identity Theft, and Credit Card Fraud*, U.S. ATTORNEY'S OFF., E.D.N.Y. (Oct. 10, 2023), https://www.justice.gov/usao-edny/pr/congressman-george-santos-charged-conspiracy-wire-fraud-false-statements-0 (copy attached as Siegel Decl. Ex. 19).

misrepresentations, he actually *gained* about $5,000.  Instead, Santos implies damages from
alleged copyright infringement.  In other words, he alleges that he was damaged by providing a
copyright-protected work pursuant to a limited license, and the work was then used beyond the
scope of that license in a manner that supposedly would command a higher price.  But those
damages would not satisfy the "pecuniary loss" element of a well-pleaded fraud claim.

Under New York law, a plaintiff asserting a fraud claim must plead actual losses that are
"the direct, immediate, and proximate result of the misrepresentation"; "such losses must be
'independent of other causes'" and must not be "speculative or undeterminable." *Cole v. John
Wiley & Sons, Inc.*, No. 11 Civ. 2090(DF), 2012 WL 3133520, at *16–17 (S.D.N.Y. Aug. 1,
2012) (citations omitted).  Thus, where the plaintiff's damages stem from alleged copyright
infringement – i.e., unauthorized use of the plaintiff's work without compensation – those
damages do not support a separate claim for fraud.  *See Warren v. John Wiley & Sons, Inc.*, 952
F. Supp. 2d 610, 623–24 (S.D.N.Y. 2013) (dismissing fraud claim where, "had [the defendant]
not infringed Plaintiffs' photographs, there would be no harm to Plaintiffs"); *see also Semerdjian
v. McDougal Littell*, No. 07 Civ. 7496(LMM), 2008 WL 110942, at *2–3 (S.D.N.Y. Jan. 2,
2008) ("Independent of infringement, Plaintiff has not demonstrated the existence of any
pecuniary harm, and similarly, she has not shown how [the defendant's] alleged
misrepresentations would have led to a direct and proximate loss had no infringement
occurred.").

That principle is in accord with New York's general "out-of-pocket rule," under which
"[d]amages are to be calculated to compensate plaintiffs for what they lost because of the fraud,
not to compensate them for what they might have gained." *Nielsen Co. (U.S.), LLC v. Success
Sys., Inc.*, 112 F. Supp. 3d 83, 108–09 (S.D.N.Y. 2015) (citation omitted).  Accordingly, "there

can be no recovery of profits which would have been realized in the absence of fraud."  *Id.*  Nor

can a plaintiff plead a fraud claim based on "lost business opportunities," *id.*, or "lost gross

revenue."  *Kaplan Grp. Invs. LLC v. A.S.A.P. Logistics Ltd.*, No. 22-CV-7326 (JPO), 2023 WL

6214909, at *9 (S.D.N.Y. Sept. 25, 2023).

Santos' fraud claim is analogous to other cases in which plaintiffs have attempted to

allege that a journalist made fraudulent misrepresentations to obtain negative information from

them about a matter of public concern.  Courts have regularly rejected such claims for failure to

plead or prove any out-of-pocket pecuniary loss.  *See, e.g.*, *Food Lion v. Capital Cities/ABC*, 194

F.3d 505, 512–15 (4th Cir. 1999) (reversing fraud claim for allegedly obtaining negative

information about food quality by misrepresenting reporters' identities).[15]  The same result

should follow here.

## III.    THE REMAINING CLAIMS ARE PREEMPTED BY THE COPYRIGHT ACT

Finally, Santos' breach-of-contract and unjust-enrichment claims fail as a matter of law

because they are preempted by the Copyright Act.

The alleged breach of contract amounts to nothing more than exceeding the scope of

"Cameo's standard personal use license agreement."  Compl. ¶ 61.  Even assuming *arguendo*

---

[15] *See also La Luna Enters., Inc. v. CBS Corp.*, 74 F. Supp. 2d 384, 392 (S.D.N.Y. 1999) (dismissing fraud claim premised on allegation that a TV reporter had gained plaintiff's consent to film on his business premises by misrepresenting nature of the story); *Ramirez v. Time, Inc.*, 12 Media L. Rep. (BNA) 2230 (Sup. Ct. N.Y. Cnty. 1986), *aff'd*, 134 A.D.2d 970 (1st Dep't 1987) (dismissing fraud claim alleging that plaintiff was fraudulently induced to grant an interview); *Frome v. Renner*, 26 Media L. Rep. (BNA) 1956 (C.D. Cal. 1997) (dismissing fraud claim against reporter who allegedly obtained videotapes through fraud); *Raskin v. Swann*, 454 S.E.2d 809, 811 (Ga. Ct. App. 1995) ("[E]ven if we were to assume the allegations that the reporter deceived plaintiff and fraudulently induced him to give the interview were truthful ... plaintiff's complaint fails to state a claim for which money damages may be awarded."); *Homsy v. King World Ent., Inc.*, No. 01-96-00708-CV, 1997 WL 52154, at *5 (Tex. Ct. App. Feb. 6, 1997) (alleged fraudulent inducement of videotaped interview cannot support claims for "nonpecuniary damages for mental anguish resulting from [the reporter's] misrepresentations" nor "pecuniary damages for losses resulting from disclosure of confidential information about himself ... and from providing filmed footage of himself").

that pleads the basis of any kind of contractual obligation to Santos on the part of Defendants, it

is well settled that a claim for use of a work beyond the scope of a license "sound[s] in copyright

infringement, not breach of contract." *Sohm v. Scholastic Inc.*, 959 F.3d 39, 47 (2d Cir. 2020)

(citation omitted).  Accordingly, courts consistently hold that such claims are "preempted by the

Copyright Act and must be dismissed."[16] *IBM Corp. v. Micro Focus (US), Inc.*, 676 F. Supp. 3d

263, 277 (S.D.N.Y. 2023) (holding that breach-of-contract claim based on allegations that

defendant "breached the parties' agreements by exceeding its license" and "infringing

[plaintiff's] exclusive rights" was preempted); *see also Universal Instruments Corp. v. Micro*

*Sys. Eng'g, Inc.*, 924 F.3d 32, 49 (2d Cir. 2019) (holding that contract claim against licensee

"whose use arguably exceeds the scope ... of a license" is preempted where it "seeks solely to

vindicate an exclusive right under the Copyright Act"); *Dow Jones & Co., Inc. v. Juwai Ltd.*, No.

21-cv-7284 (PKC), 2023 WL 2561588, at *7–8 (S.D.N.Y. Mar. 17, 2023) (citing *ML Genius*

*Holdings LLC v. Google LLC*, No. 20-3113, 2022 WL 710744, at *4 (2d Cir. Mar. 10, 2022))

(holding that breach of a website's terms of service regarding "copying and production" of the

site's content was preempted because the contract claim concerned "the same right [plaintiff]

seeks to protect through its copyright claim").

Santos' claim for unjust enrichment is likewise preempted.  As pled, he is seeking to

---

[16] In determining whether a state-law claim is preempted by the Copyright Act, courts look to whether
"(i) the work at issue 'come[s] within the subject matter of copyright' and (ii) the right being asserted is
'equivalent to any of the exclusive rights within the general scope of copyright.'" *Forest Park Pictures v.*
*Universal Television Network, Inc.*, 683 F.3d 424, 429 (2d Cir. 2012) (quoting 17 U.S.C. § 301(b)).
There is no dispute that the works at issue here – the Videos – come within the subject matter of
copyright, as they are ostensibly creative works that Santos has registered with the U.S. Copyright Office
as to which Santos is claiming infringement.  *See* 17 U.S.C. § 102(a)(6) (extending copyright protection
to "motion pictures and other audiovisual works").  And the only breach Santos alleges is unauthorized
use of the Videos beyond the limitation to "non-commercial, personal purposes" provided by "Cameo's
standard personal use license agreement."  Compl. ¶¶ 61–62.  In other words, Santos seeks to enforce his
exclusive right to publicly "perform" his "audiovisual works."  17 U.S.C. § 106(4).  His claim is squarely
within the scope of copyright and is preempted.

recover damages for Defendants' alleged "us[e] of the Cameo Videos for commercial purposes without permission or compensation," on the theory that Defendants have "unjustly retained profits and benefits at Plaintiff's expense."  Compl. ¶ 66.  But it is "well-settled law in this circuit" that this type of claim – that a defendant has "unjustly benefitted from unauthorized use" of a work – is squarely preempted by the Copyright Act.  *Stanacard, LLC v. Rubard, LLC*, No. 12 Civ. 5176, 2016 WL 462508, at *22 (S.D.N.Y. Feb. 3, 2016); *see also Bray v. Purple Eagle Ent., Inc*., No. 18 Civ. 5205 (GBD) (SLC), 2024 WL 553961, at *8 (S.D.N.Y. Jan. 3, 2024) ("[T]he overwhelming majority of courts in this circuit have held that an unjust enrichment claim based upon the copying of subject matter within the scope of the Copyright Act is preempted.").  Accordingly, this claim must be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint, with prejudice.

Dated:  April 29, 2024

Respectfully submitted,

By:  */s/ Nathan Siegel*
Nathan Siegel
Eric Feder
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
(202) 973-4200
nathansiegel@dwt.com
ericfeder@dwt.com

Raphael Holoszyc-Pimentel
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
(212) 489-8230
rhp@dwt.com

*Attorneys for Defendants James C. Kimmel a/k/a Jimmy Kimmel, American Broadcasting Companies, Inc., and The Walt Disney Company*