UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GEORGE SANTOS,

                    Plaintiff,

          - against -

JAMES C. KIMMEL a/k/a JIMMY KIMMEL,
AMERICAN BROADCASTING COMPANIES,
INC., and THE WALT DISNEY COMPANY,

                    Defendants.

Case No. 1:24-cv-01210-DLC

---

# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

Nathan Siegel
Eric Feder
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
(202) 973-4200
nathansiegel@dwt.com
ericfeder@dwt.com

Raphael Holoszyc-Pimentel
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
(212) 489-8230
rhp@dwt.com

*Attorneys for Defendants James C. Kimmel a/k/a
Jimmy Kimmel, American Broadcasting Companies,
Inc., and The Walt Disney Company*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL ALLEGATIONS ................................................................................................... 2

     A.    The Parties ................................................................................................ 2

     B.    Cameo Videos ........................................................................................... 2

         1.    User Terms of Service (Site Terms) ........................................... 3

         2.    Talent Terms of Service (Talent Terms) ..................................... 4

     C.    Public Scrutiny of Santos' Resort to Making Cameo Videos .................... 4

     D.    Kimmel's Critique of Santos' Cameo Videos .......................................... 5

     E.    The Amended Complaint ........................................................................... 7

LEGAL STANDARD ............................................................................................................. 7

ARGUMENT ......................................................................................................................... 8

I.     SANTOS' COPYRIGHT CLAIM IS BARRED BY THE FAIR USE DOCTRINE ......... 8

     A.    The Purpose and Character of the Use Was Highly Transformative ..................... 9

     B.    The Nature of the Work Was Minimally Creative and Previously Published ...... 15

     C.    The Portion Used Was Integral to the Criticism .................................................. 17

     D.    The Use Had No Effect on the Market Because There Is No Viable Market for Critical Broadcast Use of the Videos ............................................................. 18

II.    THE FRAUD CLAIM FAILS FOR LACK OF OUT-OF-POCKET LOSS .................... 19

III.   THE REMAINING CLAIMS FAIL AND ARE PREEMPTED ..................................... 21

CONCLUSION .................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adjmi v. DLT Ent. Ltd.*,
  97 F. Supp. 3d 512 (S.D.N.Y. 2015).....................................................................18

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
  598 U.S. 508 (2023)........................................................................8, 9, 11, 12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).......................................................................................7

*Authors Guild v. Google, Inc.*,
  804 F.3d 202 (2d Cir. 2015)......................................................................10, 13

*Bagdadi v. Nazar*,
  84 F.3d 1194 (9th Cir. 1996) .........................................................................16

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).......................................................................................7

*Blanch v. Koons*,
  467 F.3d 244 (2d Cir. 2006)......................................................................13, 15

*Boesen v. United Sports Publ'ns, Ltd.*,
  No. 20-cv-1552-ARR-SIL, 2020 WL 6393010 (E.D.N.Y. Nov. 2, 2020) .............4

*Bray v. Purple Eagle Ent., Inc.*,
  No. 18-cv-5205-GBD-SLC, 2024 WL 553961 (S.D.N.Y. Jan. 3, 2024).............25

*BroadVision Inc. v. Gen. Elec. Co.*,
  No. 08-cv-1478-WHP, 2009 WL 2603145 (S.D.N.Y. Aug. 13, 2009) .................25

*Brody v. Fox Broad. Co.*,
  No. 22-cv-6249-DLC, 2023 WL 2758730 (S.D.N.Y. Apr. 3, 2023) (Cote, J.) .......8

*Bus. Casual Holdings, LLC v. YouTube, LLC*,
  No. 21-cv-3610-JGK, 2022 WL 837596 (S.D.N.Y. Mar. 21, 2022) ......................3

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)............................................................................... *passim*

*Condit v. Dunne*,
  317 F. Supp. 2d 344 (S.D.N.Y. 2004)...............................................................4

*Dow Jones & Co. v. Juwai Ltd.*,
   No. 21-cv-7284-PKC, 2023 WL 2561588 (S.D.N.Y. Mar. 17, 2023)....................................25

*Fioranelli v. CBS Broad. Inc.*,
   551 F. Supp. 3d 199 (S.D.N.Y. 2021)....................................................................................14

*Food Lion v. Capital Cities/ABC*,
   194 F.3d 505 (4th Cir. 1999) .................................................................................................20

*Forest Park Pictures v. Universal Television Network, Inc.*,
   683 F.3d 424 (2d Cir. 2012).....................................................................................................24

*Frome v. Renner*,
   No. 97-cv-5641, 1997 WL 33308718 (C.D. Cal. Oct. 1, 1997) ...............................................20

*Google LLC v. Oracle Am., Inc.*,
   593 U.S. 1 (2021)......................................................................................................................14

*Gottlieb Dev. LLC v. Paramount Pictures Corp.*,
   590 F. Supp. 2d 625 (S.D.N.Y. 2008).......................................................................................6

*Hertz Glob. Holdings, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
   530 F. Supp. 3d 447 (S.D.N.Y. 2021).......................................................................................8

*Homsy v. King World Ent., Inc.*,
   No. 01-96-00708-CV, 1997 WL 52154 (Tex. Ct. App. Feb. 6, 1997) ...................................21

*Hosseinzadeh v. Klein*,
   276 F. Supp. 3d 34 (S.D.N.Y. 2017).......................................................................................11

*Hughes v. Benjamin*,
   437 F. Supp. 3d 382 (S.D.N.Y. 2020).........................................................................4, 10, 11

*Hustler Mag., Inc. v. Falwell*,
   485 U.S. 46 (1988)....................................................................................................................12

*IBM Corp. v. Micro Focus (US), Inc.*,
   676 F. Supp. 3d 263 (S.D.N.Y. 2023).......................................................................................24

*Ithaca Cap. Invs. I S.A. v. Trump Panama Hotel Mgmt. LLC*,
   450 F. Supp. 3d 358 (S.D.N.Y. 2020).......................................................................................19

*Jill Stuart (Asia) LLC v. Sanei Int'l Co.*,
   No. 13-cv-1338-KBF, 2013 WL 1769960 (S.D.N.Y. Apr. 25, 2013), *aff'd*, 548 F. App'x 20
   (2d Cir. 2013)............................................................................................................................22

*Kane v. Comedy Partners*,
    No. 00-cv-158-GBD, 2003 WL 22383387 (S.D.N.Y. Oct. 16, 2003), *aff'd*, 98 F. App'x 73
    (2d Cir. 2004) .......................................................................................................... 10, 14, 15

*Kaplan Grp. Invs. LLC v. A.S.A.P. Logistics Ltd.*,
    No. 22-cv-7326-JPO, 2023 WL 6214909 (S.D.N.Y. Sept. 25, 2023) ..................................... 20

*Kelly-Brown v. Winfrey*,
    717 F.3d 295 (2d Cir. 2013) ................................................................................................... 8

*Kimberley v. Penguin Random House*,
    No. 17-cv-5107-LTS-KHP, 2018 WL 1918614 (S.D.N.Y. Apr. 19, 2018) ............................ 16

*La Luna Enters., Inc. v. CBS Corp.*,
    74 F. Supp. 2d 384 (S.D.N.Y. 1999) ...................................................................................... 20

*Larson v. Dorland*,
    No. 1:19-cv-10203-IT, 2023 WL 5985251 (D. Mass. Sept. 14, 2023) ................................... 14

*Leibovitz v. Paramount Pictures Corp.*,
    137 F.3d 109 (2d Cir. 1998) ................................................................................................. 13

*Lombardo v. Dr. Seuss Enters.*,
    279 F. Supp. 3d 497 (S.D.N.Y. 2017), *aff'd*, 729 F. App'x 131 (2d Cir. 2018) ..................... 8

*Martinez v. Agway Energy Servs., LLC*,
    88 F.4th 401 (2d Cir. 2023) .................................................................................................. 24

*Monsarrat v. Newman*,
    28 F.4th 314 (1st Cir. 2022) .................................................................................................. 14

*N. Jersey Media Grp. Inc. v. Pirro*,
    74 F. Supp. 3d 605 (S.D.N.Y. 2015) ...................................................................................... 16

*Nielsen Co. (U.S.), LLC v. Success Sys., Inc.*,
    112 F. Supp. 3d 83 (S.D.N.Y. 2015) ...................................................................................... 20

*Nunez v. Caribbean Int'l News Corp.*,
    235 F.3d 18 (1st Cir. 2000) ................................................................................................... 17

*NXIVM Corp. v. Ross Inst.*,
    364 F.3d 471 (2d Cir. 2004) .......................................................................................... 9, 13, 18

*Otto v. Hearst Commc'ns, Inc.*,
    345 F. Supp. 3d 412 (S.D.N.Y. 2018) .................................................................................... 16

*Ramirez v. Time, Inc.*, 12 Media L. Rep. (BL) 2230 (Sup. Ct. N.Y. Cnty. 1986), *aff'd*, 134
    A.D.2d 970 (1st Dep't 1987) ................................................................................................. 20

*Raskin v. Swann*,
    454 S.E.2d 809 (Ga. Ct. App. 1995) ....................................................................20

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004) .............................................................................22

*Schneider v. Pearson Educ., Inc.*,
    No. 12-cv-6392-JPO, 2013 WL 1386968 (S.D.N.Y. Apr. 5, 2013) ....................19

*Semerdjian v. McDougal Littell*,
    No. 07-cv-7496-LMM, 2008 WL 110942 (S.D.N.Y. Jan. 2, 2008) ....................21

*Shake Shack Enters., LLC v. Brand Design Co.*,
    No. 22-cv-7713-VM, 2023 WL 9003713 (S.D.N.Y. Dec. 28, 2023) ....................22

*Sketchworks Indus. Strength Comedy, Inc. v. Jacobs*,
    No. 19-cv-7470-LTS-VF, 2022 WL 1501024 (S.D.N.Y. May 12, 2022) ..............18

*Smith v. New Line Cinema*,
    No. 03-cv-5274-DC, 2004 WL 2049232 (S.D.N.Y. Sept. 13, 2004) ....................25

*Stanacard, LLC v. Rubard, LLC*,
    No. 12-cv-5176, 2016 WL 462508 (S.D.N.Y. Feb. 3, 2016) .................................25

*Stephenson v. PricewaterhouseCoopers, LLP*,
    482 F. App'x 618 (2d Cir. 2012) .........................................................................19

*Sundeman v. Seajay Soc'y, Inc.*,
    142 F.3d 194 (4th Cir. 1998) ..............................................................................18

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
    756 F.3d 73 (2d Cir. 2014) ........................................................................ *passim*

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
    861 F. Supp. 2d 336 (S.D.N.Y. 2012), *aff'd*, 756 F.3d 73 (2d Cir. 2014) ..............14

*Sylo Supply, Inc. v. Juzihao Res. Mgmt. Co.*,
    No. 20-cv-5633-EK-MMH, 2023 WL 6370863 (E.D.N.Y. Sept. 28, 2023), *adopted*, 2023
    WL 6845865 (E.D.N.Y. Oct. 17, 2023) ................................................................15

*TCA Television Corp. v. McCollum*,
    839 F.3d 168 (2d Cir. 2016) .................................................................................8

*United States v. Devolder Santos*, Cr. No. 23-197 (S-2) (JS) (AYS), ECF No. 79 (E.D.N.Y.
    May 28, 2024) .......................................................................................................2

*Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*,
    924 F.3d 32 (2d Cir. 2019) ...................................................................................25

*Warren v. John Wiley & Sons, Inc.*,
    952 F. Supp. 2d 610 (S.D.N.Y. 2013)....................................................................21

*Wilder v. Hoiland*,
    No. 22-cv-1254-PKC, 2024 WL 382141 (S.D.N.Y. Feb. 1, 2024) .........................14

*Yang v. Mic Network, Inc.*,
    405 F. Supp. 3d 537 (S.D.N.Y. 2019), *aff'd*, No. 20-4097, 2022 WL 906513 (2d Cir.
    Mar. 29, 2022)..............................................................................................8, 14, 17

*Yang v. Mic Network Inc.*,
    No. 20-4097, 2022 WL 906513 (2d Cir. Mar. 29, 2022)...................................11, 14

*Yout, LLC v. Recording Indus. Ass'n of Am., Inc.*,
    633 F. Supp. 3d 650 (D. Conn. 2022)....................................................................3

**Statutes and Rules**

17 U.S.C.
    § 102............................................................................................................24
    § 106............................................................................................................24
    § 107............................................................................................................*passim*
    § 301............................................................................................................24

Fed. R. Civ. P. 12 .................................................................................................1

**Other Authorities**

Bess Levin, *George Santos Is Making a Ridiculous Amount of Money on Cameo*, VANITY FAIR
    (Dec. 6, 2023), https://www.vanityfair.com/news/2023/12/george-santos-cameo-earnings.....4

Cameo, TIKTOK (Dec. 6, 2023),
    https://www.tiktok.com/@cameo/video/7309503020906056991 ............................5

George Santos (@MrSantosNY), TWITTER (Dec. 4, 2023),
    https://twitter.com/MrSantosNY/status/1731793391992643992 ..............................5

*George Santos Cashing in on Cameo...After Congress Expulsion*, TMZ (Dec. 4, 2023),
    https://www.tmz.com/2023/12/04/george-santos-joins-cameo-after-expelled-congress/ .........5

Gloria Oladipo, *George Santos Reportedly Making Six Figures by Selling Cameo Videos*, THE
    GUARDIAN (Dec. 6, 2023), https://www.theguardian.com/us-news/2023/dec/06/george-
    santos-cameo-income-salary...............................................................................4

H.R. Res. 878, 118th Cong. (Dec. 1, 2023) .............................................................2

Marcia Kramer, *Former Rep. George Santos Says He Makes More Money from Cameo than He Did in Congress*, CBS NEWS (Dec. 10, 2023), https://www.cbsnews.com/newyork/news/george-santos-cameo-income-congress-the-point-with-marcia-kramer/ .................................4

Olivia Craighead, *Everyone Wants a George Santos Cameo for Christmas, Apparently*, N.Y. MAG.: THE CUT (Dec. 4, 2023), https://www.thecut.com/2023/12/george-santos-has-joined-cameo.html ...............................................................................................................................5

Press Release, *Congressman George Santos Charged with Conspiracy, Wire Fraud, False Statements, Falsification of Records, Aggravated Identity Theft, and Credit Card Fraud*, U.S. ATTORNEY'S OFF., E.D.N.Y. (Oct. 10, 2023), https://www.justice.gov/usao-edny/pr/congressman-george-santos-charged-conspiracy-wire-fraud-false-statements-0 ......19

Ross Anderson, *George Santos Is Demanding $20,000 from Jimmy Kimmel for Cameos*, THE SPECTATOR (Dec. 11, 2023), https://thespectator.com/topic/george-santos-cameo-jimmy-kimmel-demanding-20000/ ..................................................................................................6

Shakira Crístal (@planejanesnewleaf), TIKTOK (Dec. 6, 2023), https://www.tiktok.com/@planejanesnewleaf/video/7309703932790459679 .........................5

Defendants respectfully submit this memorandum of law in support of their motion to dismiss the Amended Complaint (ECF No. 20) with prejudice under Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

This case presents a paradigmatic example of a protected fair use. Plaintiff George Santos, describing himself as "a public figure known for his career in politics and finance" (Am. Compl. ¶ 5), is suing Defendants for copyright infringement and related state-law claims. The case arises out of Santos' latest foray into "finance": making videos through the celebrity video-sharing platform Cameo in exchange for money. Santos' decision to exploit his public notoriety by joining Cameo, just three days after he was expelled from Congress for gross financial misconduct, generated an immediate wave of public discussion. Even before the television segments at issue here aired, the videos he began making available on his Cameo profile page were the subject of extensive public scrutiny, criticism, and mockery.

In this context, late-night talk show host Jimmy Kimmel (host of *Jimmy Kimmel Live!* ("JKL")) decided to test whether, even after being expelled and indicted, there was *anything* Santos would decline to publicly say in exchange for a few hundred dollars. According to the Amended Complaint, under pseudonyms, Kimmel requested over a dozen videos from Santos – each containing increasingly absurd messages. When Santos enthusiastically fulfilled each request, JKL aired two segments that included a handful of the videos within them. They showed Santos delivering messages congratulating friends or family of the requesters on things like successfully cloning their pet schnauzer "Adolf," and "coming out as a 'furry,'" with the "fursona" of a "beav-a-pus" (combination of beaver and platypus). The JKL segments also showed a news clip of Santos boasting about how much money he was supposedly making through Cameo, and, in the second segment, Kimmel commented on the irony that Santos had reportedly threatened to sue him for fraud over these videos.

Count I alleges that by using the videos on commercial television and internet sites, Defendants exceeded the scope of licensing restrictions on Cameo videos and therefore committed copyright infringement.  That claim fails as a matter of law.  The JKL segments were political commentary on, and criticism of, videos created and disseminated by a major public figure.  That is a classic fair use.  And the state-law claims fail because they are attempts at a second bite at the apple of the copyright claim.  The Amended Complaint fails to plausibly plead any contract between Kimmel and Santos, or any breach beyond the alleged unauthorized use of the videos.  The contract and unjust-enrichment claims are thus preempted by the Copyright Act.  And the fraud claim fails because Santos does not plausibly allege the required element of out-of-pocket pecuniary loss – to the contrary, he is richer for having made these videos.

## FACTUAL ALLEGATIONS

### A.     The Parties

Santos is a former member of Congress who is under indictment for multiple counts of fraud and theft.  *See* Superseding Indictment, *United States v. Devolder Santos*, Cr. No. 23-197 (S-2) (JS) (AYS), ECF No. 79 (E.D.N.Y. May 28, 2024); H.R. Res. 878, 118th Cong. (Dec. 1, 2023).  Within days of his expulsion from Congress, Santos turned to Cameo, an online platform through which he creates personalized videos in exchange for money.  Am. Compl. ¶ 13.

Kimmel is the host of *Jimmy Kimmel Live!* ("JKL"), a late-night talk show on ABC.  *Id.* ¶¶ 6–8.  Each show opens with a monologue in which Kimmel often comments on and pokes fun at current events, public figures, and politicians.

### B.     Cameo Videos

Cameo is an online platform "where celebrities and public figures ... connect with their fans through personalized video messages."  Am. Compl. ¶ 1.  Through Cameo, anyone ("Users") can send a request to celebrities ("Talent") containing a message that they would like

the celebrity to deliver.  *Id.* ¶¶ 13, 15.  Users pay a fee to Cameo, which Cameo shares with the

Talent.  *See* Site Terms of Service ("Site Terms") § 7(c), (e); Talent Terms of Service ("Talent

Terms") § 4(b).[1]  If the Talent accepts the request, they record a short video with the requested

message and upload it to Cameo.  Talent Terms § 2(a).  Cameo then sends it to the User.

The respective relationships between (1) Cameo and Users, and (2) Cameo and Talent,

are governed by separate terms of service.

### 1.    User Terms of Service (Site Terms)

The relationship between Cameo and Users is governed by Cameo's Site Terms, which

also incorporate Cameo's Acceptable Use Policy and Community Guidelines ("Guidelines").

The Site Terms state that they "apply to users of, including visitors to, our Site," and that the

Talent "is governed by the Talent Terms …."  Site Terms, pmbl.  Users agree that Cameo videos

are owned by the Talent.  *Id.* § 8(a).  As is relevant here, the Site Terms provide that the Talent

grants the User a license to use the video "in any and all media" "solely for ... personal, non-

commercial, and non-promotional purposes."  *Id.* § 2(d).  What the Amended Complaint calls

this "personal use" license is what was purchased by Defendants.  Am. Compl. ¶ 22.

Cameo also offers a separate "Business Cameo" license which allows use of Cameo

videos only for promotional purposes, including "the promotion and/or endorsement of a

---

[1] On this motion to dismiss, the Court may consider Cameo's Terms of Service because they are judicially noticeable and incorporated by reference into the Amended Complaint.  *See* Am. Compl. ¶¶ 4, 14–15, 18, 65, 67–70, 73–76; *Bus. Casual Holdings, LLC v. YouTube, LLC*, No. 21-cv-3610-JGK, 2022 WL 837596, at *1 n.2 (S.D.N.Y. Mar. 21, 2022) (website's terms of service were subject to judicial notice and were integral to and expressly referenced in complaint); *Yout, LLC v. Recording Indus. Ass'n of Am., Inc.*, 633 F. Supp. 3d 650, 666–67 (D. Conn. 2022) (taking judicial notice of website's terms of service).  A copy of Cameo's Terms of Service (in effect as of the time the Videos were created) is attached as Exhibit 1 to the Declaration of Nathan Siegel (Site Terms at pp.1–9; Talent Terms at pp.20–31).  The Terms also include Cameo's Community Guidelines, attached as Exhibit 2 to the Siegel Declaration ("Guidelines").

product, service, brand, or business."  Site Terms § 3(a).  But, under the Cameo Terms, the

Business Cameo license "specifically exclud[es], in all cases, [use on] television."  *Id.* § 3(b)(i).

The Guidelines address how Cameo may enforce any violation of its Terms.  Notably,

they provide that "[i]n limited circumstances, we may, in our sole discretion, allow exceptions to

our content removal policies when we determine the material serves the public interest, such as

content that is clearly satirical, scientific, or educational in nature."  Guidelines § B.

### 2.  Talent Terms of Service (Talent Terms)

The relationship between Talent and Cameo is governed solely by the "Talent Terms,"

which "apply solely to Talent Users of our Site."  Talent Terms, pmbl.  In addition to the license

that the Talent agrees to grant to Users (*id.* § 6(b)(i)), the Talent may also publicly display the

Cameo videos they create on Cameo's site.  *Id.* § 6(a).  Moreover, the Talent grants Cameo a

very broad license to use the videos for Cameo's promotional purposes.  *Id.*

### C.  Public Scrutiny of Santos' Resort to Making Cameo Videos

Santos' decision to sell videos on Cameo generated significant public controversy and

discussion.[2]  In a CBS interview, Santos boasted that "by the end of this week ... I will have

made more money in seven days than I would've made in an entire year in Congress."[3]  Santos'

Cameo videos generated widespread publicity before any of the Videos at issue here were aired.[4]

---

[2] The Court may take judicial notice of "the fact of the publication of" "news articles" and public commentary to understand the "media frenzy" and to place the use of Santos' Videos "in the broader social context."  *Condit v. Dunne*, 317 F. Supp. 2d 344, 357–58 (S.D.N.Y. 2004); *see also Hughes v. Benjamin*, 437 F. Supp. 3d 382, 391 & n.4 (S.D.N.Y. 2020) (taking judicial notice of news articles to show that defendant's fair use had "pejorative meaning in this context"); *Boesen v. United Sports Publ'ns, Ltd.*, No. 20-cv-1552-ARR-SIL, 2020 WL 6393010, at *5 & n.6 (E.D.N.Y. Nov. 2, 2020).

[3] Marcia Kramer, *Former Rep. George Santos Says He Makes More Money from Cameo than He Did in Congress*, CBS NEWS (Dec. 10, 2023), https://www.cbsnews.com/newyork/news/george-santos-cameo-income-congress-the-point-with-marcia-kramer/ (copy attached as Siegel Decl. Ex. 3).

[4] *E.g.*, Bess Levin, *George Santos Is Making a Ridiculous Amount of Money on Cameo*, VANITY FAIR (Dec. 6, 2023), https://www.vanityfair.com/news/2023/12/george-santos-cameo-earnings (copy attached as Siegel Decl. Ex. 4); Gloria Oladipo, *George Santos Reportedly Making Six Figures by Selling Cameo*

For example, U.S. Senator John Fetterman ridiculed Santos by soliciting from him a Cameo video ostensibly "to give 'Bobby from Jersey' some advice" with his "legal problems." Fetterman then posted the Cameo video on Twitter (a/k/a X) as if it were directed at advising the "ethically-challenged" Senator Robert Menendez.[5]  In fact, likely because Cameo permits Santos to publicly display his videos on his Cameo profile, both the media and others began to notice and repost Santos' Cameo videos,[6] including some of the Videos at issue in this case, several days *before* they were ever broadcast on television.[7]

### D.    Kimmel's Critique of Santos' Cameo Videos

The Amended Complaint alleges that Kimmel, using fake names, solicited 14 videos from Santos, and Santos fulfilled all of them by "[r]elying" on the requests (the "Videos").  Am. Compl. ¶¶ 20–21.  They included requests that Santos:

- Express support for a friend who "just came out as a Furry" called a "Beav-a-pus," which is "a platypus mixed with a beaver."  The request also asks Santos to do a loud "Yiff yiff yiff," which is "the sound Beav-a-pus makes."  *Id.* ¶ 60(e).

- Congratulate a "legally blind" niece for "passing her driving test," and wish her a speedy recovery after her "really bad car accident" from which she is recovering "with help from Jesus and President Trump."  *Id.* ¶ 60(d).

---

*Videos*, THE GUARDIAN (Dec. 6, 2023), https://www.theguardian.com/us-news/2023/dec/06/george-santos-cameo-income-salary (copy attached as Siegel Decl. Ex. 5); *George Santos Cashing in on Cameo...After Congress Expulsion*, TMZ (Dec. 4, 2023), https://www.tmz.com/2023/12/04/george-santos-joins-cameo-after-expelled-congress/ (copy attached as Siegel Decl. Ex. 6).

[5] Santos replied that he did not know "the Bobby in question" was actually Senator Bob Menendez, adding "LOL" and a laughing emoji.  George Santos (@MrSantosNY), TWITTER (Dec. 4, 2023), https://twitter.com/MrSantosNY/status/1731793391992643992 (copy attached as Siegel Decl. Ex. 7).

[6] *E.g.*, Cameo, TIKTOK (Dec. 6, 2023), https://www.tiktok.com/@cameo/video/7309503020906056991 (Santos' videos were "not on our 2023 bingo card") (attached as Siegel Decl. Ex. 8); Olivia Craighead, *Everyone Wants a George Santos Cameo for Christmas, Apparently*, N.Y. MAG.: THE CUT (Dec. 4, 2023), https://www.thecut.com/2023/12/george-santos-has-joined-cameo.html (displaying Santos' videos reposted on TikTok accounts @georgiescameos and @jackbowers01) (attached as Siegel Decl. Ex. 9).

[7] *E.g.*, Shakira Crístal (@planejanesnewleaf), TIKTOK (Dec. 6, 2023), https://www.tiktok.com/@planejanesnewleaf/video/7309703932790459679 (reposting Santos' video on the "beloved schnauzer Adolf") (copy attached as Siegel Decl. Ex. 10).

- Congratulate a mother for "cloning ... her beloved schnauzer Adolf" after going "through a lot of dogs in the trial run."  *Id.* ¶ 60(b).

- Implore the requester's wife to call him because he hasn't seen the kids since he "burned down the shed shooting off fireworks," but he wants the "family together on Christmas or if not that Valentimes [sic] Day or Flag [sic]."  *Id.* ¶ 60(c).

- Congratulate a friend for winning the "Clearwater Florida Beef Eating Contest" by eating "6 pounds of loose ground beef in under 30 minutes."  *Id.* ¶ 60(a).

On December 7, during his opening monologue, Kimmel discussed "disgraced former Congressman George Santos, who has a new gig making videos on Cameo."  *Id.* ¶ 25; Siegel Decl. Ex. 11.[8]  Kimmel explained that he sent Santos "a number of different ridiculous requests" because he wanted to "find out: Will Santos Say It?"  Kimmel then read the verbatim text of three of the requests and each time asked the audience, "Will Santos Say It?"  Each time, the audience learned the answer was "Yes."  Kimmel played the corresponding Video, in which Santos enthusiastically read the request nearly verbatim in a selfie-style video, each approximately 20–45 seconds long.  After playing each Video, Kimmel interjected additional mocking commentary, such as his imitation of Santos blowing a kiss to the dog "Adolf."

On December 11, *The Spectator* published an article about Kimmel's monologue and quoted Santos.[9]  According to the article, Santos claimed that Kimmel owed him an additional $21,800 for commercial broadcast use of the three videos and threatened suit.  That night,

---

[8] Because Defendants' broadcasts are "referred to in the complaint" and are "integral" to the claims, they are "deemed incorporated into the complaint by reference" and can be considered on this motion to dismiss.  *Gottlieb Dev. LLC v. Paramount Pictures Corp.*, 590 F. Supp. 2d 625, 630 n.1 (S.D.N.Y. 2008).  Accordingly, the relevant portion of the December 7 broadcast of JKL is attached as Exhibit 11 to the Siegel Declaration and is also available at https://www.youtube.com/watch?v=iyoRHDkJKlo&t=413s.  The relevant portion of the December 11 broadcast of JKL is attached as Exhibit 12 to the Siegel Declaration and is also available at https://www.youtube.com/watch?v=5-4SUO4Rlik&t=410s.

[9] Ross Anderson, *George Santos Is Demanding $20,000 from Jimmy Kimmel for Cameos*, THE SPECTATOR (Dec. 11, 2023), https://thespectator.com/topic/george-santos-cameo-jimmy-kimmel-demanding-20000/ (copy attached as Siegel Decl. Ex. 13).

Kimmel aired another opening monologue.  This time, it began with an excerpt from the CBS interview where the reporter noted that Santos "found a new career on Cameo" "within four seconds of leaving office" and asked him incredulously, "What is that about?"  Siegel Decl. Ex. 12.  Kimmel then noted Santos' boast about how much money he was making and said that he sent Santos "a bunch of crazy video requests" because he "wanted to see what he would read and what he wouldn't read."  *Id.*; Am. Compl. ¶ 27.  Kimmel then displayed the headline of the *Spectator* article published earlier that day and commented, "Could you imagine if I get sued by George Santos for fraud? ... It would be like a dream come true."

Asking "Will Santos Say It?", Kimmel proceeded to read two requests that were even more ridiculous than the ones he read a few nights earlier.  Once again, Santos enthusiastically repeated the requests nearly word for word.  Emphasizing the absurdity of the Videos, Kimmel then repeated the "yiff yiff yiff" "beav-a-pus" call.

### E.   The Amended Complaint

Santos' initial complaint asserted claims for copyright infringement, fraudulent inducement, breach of contract, and unjust enrichment.  *See* ECF No. 1.  The Amended Complaint pleads an additional claim for breach of implied contract.

### <u>LEGAL STANDARD</u>

To survive a motion to dismiss for failure to state a claim, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible only if the plaintiff pleads "factual content" that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  Although an affirmative defense, the issue of fair use may be resolved on a motion to dismiss where the defense is "clearly established" by the complaint and a side-by-side comparison of the works at

issue.  *TCA Television Corp. v. McCollum*, 839 F.3d 168, 178 (2d Cir. 2016); *see also Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 86 (2d Cir. 2014); *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013).  In light of these principles, courts regularly grant motions to dismiss on the ground of fair use.[10]  Finally, where a plaintiff's claims arise out of alleged breach of contract, "the Court may dismiss ... for failure to state a claim if the 'plain language' of the contract contradicts or fails to support the plaintiff's allegations of breach.'" *Hertz Glob. Holdings, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 530 F. Supp. 3d 447, 454 (S.D.N.Y. 2021) (citation omitted).

## ARGUMENT

## I.  SANTOS' COPYRIGHT CLAIM IS BARRED BY THE FAIR USE DOCTRINE

Santos alleges that Defendants committed copyright infringement by exceeding the scope of a personal use license.  That claim fails because Kimmel's use of the Videos to comment on and mock a controversial political figure was the quintessential example of a fair use.

Section 107 of the Copyright Act lists four non-exclusive factors to consider in determining whether a particular use of a copyrighted work is a fair use:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.  The four factors must be considered together, not "treated in isolation."  *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 550 (2023) (citation

---

[10] *See, e.g.*, *Brody v. Fox Broad. Co.*, No. 22-cv-6249-DLC, 2023 WL 2758730, at *2 (S.D.N.Y. Apr. 3, 2023) (Cote, J.); *Yang v. Mic Network, Inc.*, 405 F. Supp. 3d 537, 542 (S.D.N.Y. 2019), *aff'd*, No. 20-4097, 2022 WL 906513 (2d Cir. Mar. 29, 2022); *Lombardo v. Dr. Seuss Enters.*, 279 F. Supp. 3d 497, 504–05 (S.D.N.Y. 2017), *aff'd*, 729 F. App'x 131 (2d Cir. 2018).

omitted).  Moreover, "[a]lthough defendants bear the burden of proving that their use was fair, they need not establish that each of the factors set forth in § 107 weighs in their favor."  *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 476–77 (2d Cir. 2004) (citation omitted).

Here, a weighing of the factors establishes as a matter of law that Defendants' airing of the Videos within the context of critical segments on JKL was a protected fair use.

### A.     The Purpose and Character of the Use Was Highly Transformative

The first factor weighs strongly in favor of fair use and, nearly alone, decides the case. This factor considers "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes."  17 U.S.C. § 107(1).  Courts recognize a "strong presumption" that the first factor "tilt[s] in the defendants' favor" where the secondary work falls within one or more of the uses described in the preamble to § 107: "criticism, comment, news reporting, ... scholarship, or research."  *NXIVM*, 364 F.3d at 476–77. The use here was squarely for purposes of criticism and comment.

The Supreme Court recently revisited the first factor in *Warhol*.  Its analysis makes clear why this case involves an archetypical fair use.  As the Court explained, "[t]his factor considers the reasons for, and nature of, the copier's use of an original work," with the "'central' question" being "whether the new work merely 'supersede[s] the objects' of the original creation ... or instead adds something new, with a further purpose or different character."  *Warhol*, 598 U.S. at 527–28 (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)).  "A use that has a further purpose or different character is said to be 'transformative.'"  *Id.* at 529.

As *Warhol* emphasized, "[c]riticism of a work ... ordinarily does not supersede the objects of, or supplant, the work.  Rather, it uses the work to serve a distinct end."  *Id.* at 528; *see also id.* at 532 ("[C]ommentary or criticism that targets an original work may have compelling reason to 'conjure up' the original by borrowing from it.").  The Second Circuit has long

9

construed the first factor the same way.  *See, e.g.*, *Authors Guild v. Google, Inc.*, 804 F.3d 202, 215–16 (2d Cir. 2015) ("[C]opying from an original for the purpose of criticism or commentary on the original or provision of information about it, tends most clearly to satisfy *Campbell*'s notion of the 'transformative' purpose involved in the analysis of Factor One." (footnotes omitted)).  Thus, "faithfully reproduc[ing] an original work without alteration" can be transformative in light of the "altered purpose or context of the work, as evidenced by surrounding commentary or criticism."  *Swatch*, 756 F.3d at 84 (holding that publication of full audio recording of plaintiff company's investor phone call was transformative fair use).

Consistent with these principles, in *Kane v. Comedy Partners*, when the satirical, comedic TV program *The Daily Show* used a video clip from the plaintiff's public access show in a segment that mocked public access shows, that was considered protected fair use.  *Kane v. Comedy Partners*, No. 00-cv-158-GBD, 2003 WL 22383387, at *4 (S.D.N.Y. Oct. 16, 2003), *aff'd*, 98 F. App'x 73, 73–74 (2d Cir. 2004) (affirming "[f]or substantially the reasons set forth by the district court in its thorough and well-reasoned opinion").  As the district court explained, ridiculing someone else's work – be it in the form of parody (which alters the original work) or mocking commentary (which, both here and in *Kane*, preserves the original work) – is often a fair use because it "*comments*[] on that author's work[]."  *Id.* (citation omitted).  *The Daily Show* incorporated the plaintiff's clip into a segment containing a "succession of other public access clips," "accompanied by" the defendant's "derisive," "smirking commentary," and the court found the "critical nature of the use" readily apparent.  *Id.*

Likewise, in *Hughes v. Benjamin*, the court granted a motion to dismiss an infringement claim over the defendant's posting of a video consisting entirely of unaltered clips from a YouTube video created by the plaintiff, with a derisive title mocking plaintiff's politics and

10

purported lack of self-awareness.  *Hughes v. Benjamin*, 437 F. Supp. 3d 382, 391 (S.D.N.Y.

2020).  The court held that it was "clear from the face of [the] Complaint that [the defendant]

copied portions of [the plaintiff's video] for the transformative purposes of criticism and

commentary."  *Id.*; *see also Yang v. Mic Network Inc.*, No. 20-4097, 2022 WL 906513, at *2 (2d

Cir. Mar. 29, 2022) (affirming dismissal of claim from use of plaintiff's photo that had appeared

on the cover of the *New York Post* because the defendant used the image "to cover the public's

lampooning of the Post article and provide [the defendant's] own commentary" on and "criticism

of the Post article"); *Hosseinzadeh v. Klein*, 276 F. Supp. 3d 34, 39–40 (S.D.N.Y. 2017)

(expressing "no doubt" that YouTube video containing clips of plaintiff's video interspersed with

"mockery," "criticism and commentary" on plaintiff's video was fair use).

  The same analysis applies here.  The Videos were shown on both JKL segments to mock

and criticize Santos' decision to immediately pivot from being expelled from Congress for

financial misconduct to a "new gig" selling Cameo videos, in a manner that suggested he still

had no shame about doing anything for money.  The thrust of the first segment was to see

whether Santos would be willing to say patently ridiculous things in exchange for several

hundred dollars.  Each Video was introduced by Kimmel first reading out loud the "ridiculous

request[]" sent to Santos, followed by the question: "Will Santos Say It?"  In addition, the second

segment further mocked Santos by making the point that no matter how ridiculous a Video might

be, Santos had no shame about demanding even more money and threatening lawsuits.

  In this regard, JKL's use of the Videos is analogous to Andy Warhol's famous

Campbell's "Soup Cans" series of screen-prints, which the Supreme Court recently analyzed in

*Warhol*.  As the Court noted, "[t]he purpose of Campbell's logo is to advertise soup.  Warhol's

canvases do not share that purpose.  Rather, the Soup Cans series uses Campbell's copyrighted

work for an artistic commentary on consumerism, a purpose that is orthogonal to advertising

soup." *Warhol*, 598 U.S. at 539.  The Court explained further that:

> [Warhol's] Soup Cans series targets the logo.  That is, the original copyrighted
> work is, at least in part, the object of Warhol's commentary.  It is the very nature
> of Campbell's copyrighted logo—well known to the public, designed to be
> reproduced, and a symbol of an everyday item for mass consumption—that
> enables the commentary.  Hence, the use of the copyrighted work not only serves
> a completely different purpose, to comment on consumerism rather than to
> advertise soup, it also "conjures up" the original work to "she[d] light" on the
> work itself, not just the subject of the work.

*Id.* at 539–40.  Here too, the Videos are the "target[]" of the criticism and commentary conveyed

by the "Will Santos Say It?" segments.  The "purpose" of using the Videos – to mock the

shameless willingness of a former Congressman to make internet videos saying the absurd things

requested of him while under indictment for theft and fraud – is "completely different" from

Santos' ostensible purpose in creating the Videos to congratulate the requester's friends or

family.  Indeed, the Supreme Court has recognized that biting – even offensive – mockery of

public officials through "exploitation of ... politically embarrassing events" has long "played a

prominent role in public and political debate."  *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 54

(1988).  In short, the use of the Videos was for a specifically enumerated statutory purpose of

criticism and comment and was highly transformative.

The transformative nature of the use here also strongly outweighs the fact that JKL airs

on commercial television and internet sites.  As *Warhol* reiterated, "[t]he more transformative the

new work, the less will be the significance of other factors, like commercialism, that may weigh

against a finding of fair use."  *Warhol*, 598 U.S. at 531 (quoting *Campbell*, 510 U.S. at 579).  As

the Court has observed, "nearly all of the illustrative uses listed in the preamble paragraph of

§ 107 ... are generally conducted for profit in this country," so placing excessive importance on

commerciality would "swallow" fair use entirely.  *Campbell*, 510 U.S. at 584 (citation omitted).

Thus, the Second Circuit has "repeatedly rejected the contention that commercial motivation should outweigh a convincing transformative purpose and absence of significant substitutive competition with the original." *Authors Guild*, 804 F.3d at 219; *see Swatch*, 756 F.3d at 83 (giving "little weight" to fact that defendant is an "undisputed[ly] ... commercial enterprise"); *Blanch v. Koons*, 467 F.3d 244, 253–54 (2d Cir. 2006) ("discount[ing]" commerciality because use was "substantially transformative"); *NXIVM*, 364 F.3d at 478 (where new work was "substantially transformative, the district court properly discounted the secondary commercial nature of the use"); *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 115 (2d Cir. 1998) (holding that "strong parodic nature" of movie poster "tips the first factor significantly toward fair use, even after making some discount for the fact that it promotes a commercial product").

Finally, Santos alleges that Defendants acted in "bad faith" because he was allegedly misled about the identity of the individuals requesting the Videos and their intended uses. Am. Compl. ¶ 46. That argument fails to move the needle for two reasons. First, alleged bad faith plays little, if any, role in the fair use analysis. Second, even if that were not so, the Amended Complaint does not and cannot allege the kind of "bad faith" that might influence the analysis.

In *NXIVM*, the Second Circuit held that "while the good or bad faith of a defendant generally should be considered, it generally contributes little to fair use analysis." *NXIVM*, 364 F.3d at 479 n.2. In that case, the Court held that the fact that the defendant journalists knew their source had violated a non-disclosure agreement to provide them with the plaintiff's publications was of minimal relevance to the first-factor analysis, "in light of the transformative nature of the secondary use as criticism" of those publications. *Id.* at 479. Cases since *NXIVM* have

consistently reached the same conclusion.[11]  Indeed, in a recent decision, "the Supreme Court ... cast doubt on 'whether bad faith has any role in a fair use analysis.'"  *Wilder v. Hoiland*, No. 22-cv-1254-PKC, 2024 WL 382141, at *17 n.21 (S.D.N.Y. Feb. 1, 2024) (quoting *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 32 (2021)).

Moreover, even if a defendant's "bad faith" were relevant at all, Santos has not plausibly alleged the kind of bad faith that courts have occasionally found to be relevant, such as physically removing something crediting the work to the plaintiff to conceal its true ownership. *See, e.g.*, *Yang*, 405 F. Supp. 3d at 546 (finding bad faith "suggest[ed]" by defendant's "removing the label crediting the work to Plaintiff" on photograph).  Instead, Santos alleges that Kimmel "misrepresented himself and his intended ... use to induce Plaintiff to create personalized videos for the sole purpose of capitalizing on and ridiculing Plaintiff's gregarious personality."  Am. Compl. ¶ 2.  But multiple cases have held that similar conduct for similar purposes should not be considered bad faith in the fair use context.

For example, in the analogous context of news reporting, the district court in *Swatch* found that allegations that the defendant had "clandestinely" obtained an audio recording did not constitute bad faith.  *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 861 F. Supp. 2d 336, 340–41 (S.D.N.Y. 2012), *aff'd*, 756 F.3d 73 (2d Cir. 2014); *see also Swatch*, 756 F.3d at 83–84 (journalist's knowledge that "its use [of the plaintiff's work] was contrary to [the plaintiff's] instructions" did not constitute bad faith sufficient to affect the fair use analysis).  Likewise, considering facts even more analogous to this case, in *Kane* the court found fair use notwithstanding the allegations that the representative for *The Daily Show* had "misle[d] [the

---

[11] *See also Yang*, 2022 WL 906513, at *2; *Monsarrat v. Newman*, 28 F.4th 314, 322–23 (1st Cir. 2022); *Larson v. Dorland*, No. 1:19-cv-10203-IT, 2023 WL 5985251, at *14 (D. Mass. Sept. 14, 2023); *Fioranelli v. CBS Broad. Inc.*, 551 F. Supp. 3d 199, 242–43 (S.D.N.Y. 2021).

plaintiff] into believing that copyright law did not apply to public access television" in seeking permission to use clips from her program. *Kane*, 2003 WL 22383387, at *7. Moreover, even Cameo's Community Guidelines recognize that there may be times when the dissemination of Cameo videos in contravention of its Terms "serves the public interest, such as content that is clearly satirical, scientific, or educational in nature." Guidelines § B.

Thus, as a matter of law, the first factor strongly weighs in favor of a finding of fair use.

### B.   The Nature of the Work Was Minimally Creative and Previously Published

The second factor concerns "the nature of the copyrighted work." § 107(2). This inquiry turns on "(1) whether the work is expressive or creative, such as a work of fiction, or more factual, with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower." *Blanch*, 467 F.3d at 256.

Taking the second element of the inquiry first, there can be no dispute that the Videos had already been published when JKL aired the two segments. Santos' copyright registrations state they were all published on the same days Santos created them. *See* Am. Compl. ¶ 34; Siegel Decl. Exs. 14–18.[12] Unlike in his original Complaint, Santos now pleads that he only published the work to "Defendants." Am. Compl. ¶ 44. But that allegation makes no difference. Publication to Defendants would still mean the Videos were not unpublished, and indeed the personal use license grants broad authority to publicly display Cameo videos. Site Terms § 2(d). Moreover, Santos' publication of the Videos was not limited to Defendants. While the social

---

[12] The Court "may take judicial notice of the copyright registration information set forth in the United States Copyright Office's Public Catalog," including "the dates of first publication" of the works. *Sylo Supply, Inc. v. Juzihao Res. Mgmt. Co.*, No. 20-cv-5633-EK-MMH, 2023 WL 6370863, at *6 (E.D.N.Y. Sept. 28, 2023), *adopted*, 2023 WL 6845865 (E.D.N.Y. Oct. 17, 2023).

media commentary on the Videos suggest Santos also made the videos available online on his Cameo page, pursuant to the Talent Terms he automatically granted a license to Cameo to use the Videos for its own promotional purposes.  Talent Terms § 6(a).  That is "publication" as a matter of law.  *Bagdadi v. Nazar*, 84 F.3d 1194, 1198–99 (9th Cir. 1996).

Next, the first element of the second-factor analysis turns on the reality that "some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied."  *Campbell*, 510 U.S. at 586. In assessing this factor, courts look to the "thickness" or "thinness" of the defendant's copyright. *Swatch*, 756 F.3d at 87.  Santos' copyright is thin.

As the JKL segments make clear in introducing each Video, the text of the Videos was supplied by Defendants; outside of minor asides, Santos did not "write" any of the Videos.  *Cf. Kimberley v. Penguin Random House*, No. 17-cv-5107-LTS-KHP, 2018 WL 1918614, at *3 (S.D.N.Y. Apr. 19, 2018) (noting that "verbatim reproduction of the statements of quotations of others" is not "entitled to copyright protection").  Santos chose the framing of the Videos and performed them himself, but it is apparent they were created by simply holding up the camera on his smartphone and reading from the script provided to him.  To the extent that is protectable at all, the scope of the copyright is thin, which weighs in favor of fair use.  *See, e.g.*, *Otto v. Hearst Commc'ns, Inc.*, 345 F. Supp. 3d 412, 430 (S.D.N.Y. 2018) (holding that second factor favored fair use where smartphone photograph at party "was spontaneously taken to document its subjects, as they were in the moment"); *N. Jersey Media Grp. Inc. v. Pirro*, 74 F. Supp. 3d 605, 620 (S.D.N.Y. 2015) (collecting cases holding that "photographic works created for news gathering or other non-artistic purposes have found this factor to weigh in favor of fair use").

### C.       The Portion Used Was Integral to the Criticism

The third factor weighs "the amount and substantiality of the portion used in relation to the copyrighted work as a whole."  17 U.S.C. § 107(3).  In looking at the "amount and substantiality," the key to the inquiry is whether "the quantity and value of the materials used are reasonable *in relation to the purpose of the copying*."  *Campbell*, 510 U.S. at 586 (emphasis added) (citation omitted).  In this regard, courts have recognized that use of the plaintiff's entire work "does not necessarily weigh against fair use because copying the entirety of a work is sometimes necessary to make a fair use."  *Swatch*, 756 F.3d at 84, 90 (holding that news organization's use of entirety of investor call was fair because "the need to convey information to the public accurately may in some instances make it desirable and consonant with copyright law for a defendant to faithfully reproduce an original work without alteration").  Importantly, "[t]he law 'does not require that the secondary artist may take no more than is necessary,'" because "[t]he secondary use must be permitted to conjure up *at least* enough of the original to fulfill its transformative purpose."  *Yang*, 405 F. Supp. 3d at 546–47 (citations omitted).

Here, the transformative purpose for using the Videos was to answer the question "Will Santos Say It?" regarding a series of increasingly absurd requests.  Only by showing the full Video (each of which was quite short) can the viewer appreciate the degree to which Santos absolutely will – without any sense of shame – "say it," every time.  That comedic and critical purpose would be severely undermined by showing only a snippet of each short Video.  *See Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 24 (1st Cir. 2000) (copying an entire picture was fair where "to copy any less than that would have made the picture useless to the story"); *Yang*, 405 F. Supp. 3d at 546–47 ("If copying the original any less would make the picture useless to the story, the substantiality of the copying is of little consequence." (cleaned up)).

**D.      The Use Had No Effect on the Market Because There Is No Viable Market for Critical Broadcast Use of the Videos**

Finally, the Court must consider "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4).  In analyzing this factor, courts look to "whether the secondary use usurps the market of the original work."  *NXIVM*, 364 F.3d at 482.  Critically, however, this factor is "limit[ed]" to "consideration [of] a use's 'impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets.'"  *Swatch*, 756 F.3d at 91 (citation omitted).  This factor favors fair use as a matter of law because there is no protectible market for copyright owners to license works for the purpose of being ridiculed.

As the Supreme Court has explained:

> The market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop.  Yet the unlikelihood that creators of imaginative works will license critical reviews or lampoons of their own productions removes such uses from the very notion of a potential licensing market.

*Campbell*, 510 U.S. at 592; *see also id.* ("[T]he law recognizes no derivative market for critical works, including parody."); *Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194, 207 (4th Cir. 1998) (holding that "[i]f there were a protectible derivative market for critical works, copyright holders would only license to those who would render favorable comment," but "[t]he copyright holder cannot control the dissemination of criticism"); *Adjmi v. DLT Ent. Ltd.*, 97 F. Supp. 3d 512, 534 (S.D.N.Y. 2015) (explaining that the Supreme Court's "position" in *Campbell* "reflects that there is no protectable derivative market for criticism by acknowledging the reality that, generally speaking, authors of original works rarely want their work to be criticized," and holding that theater work parodying sitcom did not impair market for original); *Sketchworks Indus. Strength Comedy, Inc. v. Jacobs*, No. 19-cv-7470-LTS-VF, 2022 WL 1501024, at *7 (S.D.N.Y. May 12, 2022) (fourth factor weighed in favor of fair use for play that "mocks and attempts to

communicate a critical message about the misogynistic features of *Grease*").  Accordingly, this

factor also weighs in favor of fair use.[13]

## II.       THE FRAUD CLAIM FAILS FOR LACK OF OUT-OF-POCKET LOSS

The tort of fraud is not a vehicle for remedying all allegedly irksome misrepresentations.

Rather, the tort is specifically limited to conduct that divests people of money.  For example, the

kind of conduct alleged in the pending indictment against Santos – such as obtaining a donor's

credit cards under the pretense of using it solely for a political contribution, then charging

$44,800 both for himself and additional contributions under the phony names of others – is a

classic example of alleged fraud because the victim actually lost money.[14]

Here, even assuming solely for purposes of this motion that Santos could plead and prove

a knowingly false representation of material fact on which he justifiably relied, he does not and

cannot plead that "as a result of such reliance [he] sustained pecuniary loss."  *Ithaca Cap. Invs. I

S.A. v. Trump Panama Hotel Mgmt. LLC*, 450 F. Supp. 3d 358, 369 (S.D.N.Y. 2020) (quoting

*Stephenson v. PricewaterhouseCoopers, LLP*, 482 F. App'x 618, 622 (2d Cir. 2012)); *see also

Schneider v. Pearson Educ., Inc.*, No. 12-cv-6392-JPO, 2013 WL 1386968, at *5 n.6 (S.D.N.Y.

Apr. 5, 2013) ("damages are an essential element of a fraud claim").

Santos does not allege that he lost a single dollar as a result of the purported

misrepresentations.  To the contrary, because he alleges he was paid for the videos, he actually

*gained* several thousand dollars.  Instead, Santos implies damages because he says he should

---

[13] Santos' allegation that Defendants' use "devalued the market for Cameo videos" writ large is also
irrelevant.  Am. Compl. ¶ 51.  This factor considers the effect on "the potential market for or value of *the
copyrighted work*" itself, not the broader market for other works.  17 U.S.C. § 107(4) (emphasis added).

[14] *See* Press Release, *Congressman George Santos Charged with Conspiracy, Wire Fraud, False
Statements, Falsification of Records, Aggravated Identity Theft, and Credit Card Fraud*, U.S.
ATTORNEY'S OFF., E.D.N.Y. (Oct. 10, 2023), https://www.justice.gov/usao-edny/pr/congressman-george-
santos-charged-conspiracy-wire-fraud-false-statements-0 (copy attached as Siegel Decl. Ex. 19).

have made *more* money.  He alleges that he provided a copyrighted work pursuant to a limited license, while the work was intended to be used beyond the scope of that license in a manner that supposedly would command a higher price.  *See* Am. Compl. ¶ 63.  But those hypothetical damages could not satisfy the "pecuniary loss" element of a well-pleaded fraud claim.

New York's general "out-of-pocket rule" provides that "[d]amages are to be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate them for what they might have gained."  *Nielsen Co. (U.S.), LLC v. Success Sys., Inc.*, 112 F. Supp. 3d 83, 108–09 (S.D.N.Y. 2015) (citation omitted).  Accordingly, "there can be no recovery of profits which would have been realized in the absence of fraud."  *Id.*  Nor can a plaintiff plead fraud based on "lost business opportunities," *id.*, or "lost gross revenue."  *Kaplan Grp. Invs. LLC v. A.S.A.P. Logistics Ltd.*, No. 22-cv-7326-JPO, 2023 WL 6214909, at *9 (S.D.N.Y. Sept. 25, 2023).  That is exactly what is pled here.  Santos claims that but for the fraud he could have made even more money, not that he suffered any out-of-pocket loss.

Santos' fraud claim is analogous to other cases in which plaintiffs have attempted to allege fraud where a journalist made misrepresentations to obtain negative information from them.  Courts have regularly rejected such claims for failure to plead or prove any out-of-pocket pecuniary loss.  *See, e.g.*, *Food Lion v. Capital Cities/ABC*, 194 F.3d 505, 512–15 (4th Cir. 1999) (reversing fraud claim for allegedly obtaining negative information about food quality by misrepresenting reporters' identities).[15]  The same result should follow here.

---

[15] *See also La Luna Enters., Inc. v. CBS Corp.*, 74 F. Supp. 2d 384, 392 (S.D.N.Y. 1999) (dismissing fraud claim premised on allegation that reporter gained plaintiff's consent to film at his business by misrepresenting nature of the story); *Ramirez v. Time, Inc.*, 12 Media L. Rep. (BL) 2230, at *2–3 (Sup. Ct. N.Y. Cnty. 1986) (dismissing fraud claim alleging that plaintiff was fraudulently induced to grant an interview), *aff'd*, 134 A.D.2d 970 (1st Dep't 1987); *Frome v. Renner*, No. 97-cv-5641, 1997 WL 33308718, at *2–3 (C.D. Cal. Oct. 1, 1997) (dismissing fraud claim against reporter who allegedly obtained appointment through fraud); *Raskin v. Swann*, 454 S.E.2d 809, 811 (Ga. Ct. App. 1995) ("[E]ven if we were to assume the allegations that the reporter deceived plaintiff and fraudulently induced him to

Finally, courts have specifically found that where the plaintiff's alleged damages stem from copyright infringement – *i.e.*, unauthorized use of the plaintiff's work – those damages do not support a separate claim for fraud.  *See Warren v. John Wiley & Sons, Inc.*, 952 F. Supp. 2d 610, 623–24 (S.D.N.Y. 2013) (dismissing fraud claim where, "had [defendant] not infringed Plaintiffs' photographs, there would be no harm to Plaintiffs"); *Semerdjian v. McDougal Littell*, No. 07-cv-7496-LMM, 2008 WL 110942, at *2–3 (S.D.N.Y. Jan. 2, 2008) ("Independent of infringement, Plaintiff has not demonstrated the existence of any pecuniary harm, and similarly, she has not shown how [defendant's] alleged misrepresentations would have led to a direct and proximate loss had no infringement occurred.").  The fraud claims should therefore be dismissed.

## III.    THE REMAINING CLAIMS FAIL AND ARE PREEMPTED

Finally, Santos' breach-of-contract and unjust-enrichment claims also arise out of alleged use of the Videos beyond the scope of the license that Santos acknowledges Defendants paid for – the precise type of claim that courts consistently hold is preempted by the Copyright Act.  *See infra*.[16]  The Amended Complaint now tries to plead around that reality by inventing contractual rights and obligations that simply do not exist, and which are contradicted by his own allegations and the documents he incorporates.  He is thus left, at most, with the same clearly preempted claims he pleaded in the original Complaint.

---

give the interview were truthful ... plaintiff's complaint fails to state a claim for which money damages may be awarded."); *Homsy v. King World Ent., Inc.*, No. 01-96-00708-CV, 1997 WL 52154, at *5 (Tex. Ct. App. Feb. 6, 1997) (alleged fraudulent inducement of videotaped interview cannot support fraud claim).

[16] Santos' Amended Complaint adds a claim for "Breach of Implied Contract," but solely relies on the allegations he makes for his Breach of Contract claim.  *See* Am. Compl. ¶¶ 78–79.

Santos' contract claims fail because he fails to identify any actual contract with the Defendants.[17]  The Amended Complaint offers conclusory allegations of "several valid contracts" and "exchanges," but it fails to identify what terms either Kimmel supposedly offered or Santos accepted.  Am. Compl. ¶¶ 65–66.  Read liberally, Santos appears to be alleging that the "Cameo Site Terms of Service" – which, by their plain language, govern the relationship between Users *and Cameo* – somehow create a contract between Users and *Talent*.  *Id.* ¶¶ 67–70, 73–76.  But that theory finds no support in the Site Terms.[18]  And the Amended Complaint offers no explanation for how a User agreeing to particular requirements when creating an account on Cameo – such as providing the platform with "true, accurate, current, and complete information" (Am. Compl. ¶ 74) – constitutes an offer and acceptance of the terms of an entirely separate agreement with any and all Talent the User may encounter on the platform.

The allegations in the Amended Complaint confirm the opposite.  Santos several times pleads that *Defendants* agreed to various provisions of the Site Terms (*e.g.*, *id.* ¶¶ 4, 18, 70), and then allegedly breached them.  *Id.* ¶¶ 73–76.  But Santos never pleads, nor could he, that *he* agreed to the Site Terms with Defendants, nor anything else that could plausibly establish even a

---

[17] "For a breach of contract claim under New York law, a plaintiff must present plausible facts that allege (1) contract formation, (2) performance by the plaintiff, (3) breach by defendants, and (4) damages resulting from the breach."  *Jill Stuart (Asia) LLC v. Sanei Int'l Co.*, No. 13-cv-1338-KBF, 2013 WL 1769960, at *3 (S.D.N.Y. Apr. 25, 2013), *aff'd*, 548 F. App'x 20 (2d Cir. 2013); *see also Shake Shack Enters., LLC v. Brand Design Co.*, No. 22-cv-7713-VM, 2023 WL 9003713, at *3 (S.D.N.Y. Dec. 28, 2023) ("A contract plaintiff 'must plead facts surrounding the formation of the contract such as the date the parties entered into the contract, the major terms of the contract, the parties to the contract, and that the party to be bound assented to the contract.'").  The elements of contract formation are "an offer, acceptance, consideration, mutual assent and intent to be bound."  *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) (citation omitted).

[18] The Site Terms define "You" as the "user of the Site," define Cameo as "we" and "us," and make clear that the Site Terms create an agreement that "governs *your* use" of the Cameo platform, including "*our* website" and "services *we* provide through them."  Site Terms, pmbl. (emphases added).

single element of contract formation between Santos and any Defendant. That alone requires that the contract claims be dismissed.

That conclusion is reinforced by Santos' apparent theories of breach of this non-existent contract, which rely on supposed contractual terms that either could not apply to this dispute or do not exist at all in the Site Terms. For example, Santos alleges that Defendants breached a restriction on providing "misleading information" (*id.* ¶ 75), but that provision of the Site Terms applies only to "Political Cameo Products."[19] Most tellingly, his primary alleged "breach" is the assertion that Defendants "fail[ed] to pay" for the Videos that aired on JKL and the "additional videos that Kimmel purchased with the intent to air such videos on [JKL]." Am. Compl. ¶ 73; *see also id.* ¶¶ 77, 79, 82. But the Amended Complaint on its face makes plain that Defendants *did* pay for each Video – they paid the price for the personal use license they obtained. *Id.* Any alleged "breach" is a claim that Defendants' subsequent use exceeded the scope of that license (*id.* ¶ 49) – not that they "fail[ed] to pay" for the license.

To avoid that inescapable conclusion, Santos tries to say Defendants breached the Site Terms by not paying the "required amount" for the use that they secretly "contemplated," which Santos calls an "expedited commercial license." *Id.* ¶ 71. That theory is likewise meritless, for two reasons. First, any time a defendant is alleged to have exceeded the scope of a license that was duly purchased, it could be argued that the parties hypothetically could have agreed to a broader license (covering the use) at a different price. But that has no bearing on whether the defendant breached the agreement to pay for the license that was actually purchased. Santos does not and cannot allege any failure to pay for the license that was purchased – only that Defendants exceeded the scope of that license.

---

[19] Additional Site Terms, Political Cameo Products § 2(b)(i)–(iii) (Siegel Decl. Ex. 1 at p.13).

Second, the supposed "expedited commercial license" Santos claims Defendants were "required" to purchase is not even available under the Site Terms.  As Santos himself alleges, the Site Terms provide for a license limited to either "personal" use or "Business" use, but "[n]either of these licenses permits the Users to broadcast the videos on national television."  Am. Compl. ¶ 16; *see* Site Terms § 3(b)(i); *cf. Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 412 (2d Cir. 2023) (refusing to enforce contractual "promise" that is "nowhere to be found" in the applicable agreement).  Indeed, the Amended Complaint invents the supposed "price" of that non-existent license out of whole cloth – "approximately $15,000 per video."  Am. Compl. ¶ 72. Santos even contends that Defendants somehow breached a contract with respect to the "several additional videos that Kimmel purchased with the intent to air such videos" in some as-yet-unaired episode of JKL  Am. Compl. ¶¶ 63, 77, 79, 82.  Santos offers no theory for how Defendants breached any kind of express or implied promise (or were unjustly enriched) by fully paying for a particular type of license to those videos and then <u>not</u> exceeding the scope of that license.

Ultimately, Santos' creative pleading efforts cannot avoid the reality that his common-law claims are grounded in allegedly exceeding the scope of a license to a copyrighted work. Whether that claim is framed as a breach of an express or implied contract, or as a source of unjust enrichment, such claims are all "preempted by the Copyright Act and must be dismissed."[20]  *IBM Corp. v. Micro Focus (US), Inc.*, 676 F. Supp. 3d 263, 277–78 (S.D.N.Y.

---

[20] In determining whether a state-law claim is preempted, courts look to whether "(i) the work at issue 'come[s] within the subject matter of copyright' and (ii) the right being asserted is 'equivalent to any of the exclusive rights within the general scope of copyright.'"  *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 429 (2d Cir. 2012) (quoting 17 U.S.C. § 301(b)).  The Videos come within the subject matter of copyright, as they are ostensibly creative works that Santos has registered.  *See* 17 U.S.C. § 102(a)(6).  And the claims are all grounded in the allegedly unauthorized broadcast use of the Videos.  Am. Compl. ¶¶ 71, 79, 82.  In other words, Santos seeks to enforce his exclusive right to publicly "perform" his "audiovisual works" and to monetize the same.  17 U.S.C. § 106(4).

2023) (breach-of-contract claim based on allegations that defendant "breached the parties' agreements by exceeding its license" was preempted).[21]  Courts consistently hold that a claim based on an implied contractual right to "compensation for the alleged unauthorized use [of a copyrighted work] is equivalent to the exclusive rights protected by federal copyright law." *Smith v. New Line Cinema*, No. 03-cv-5274-DC, 2004 WL 2049232, at *5 (S.D.N.Y. Sept. 13, 2004).[22]  And it is "well-settled law in this circuit" that a claim that a defendant has "unjustly benefitted from unauthorized use" of a copyrighted work is preempted.  *Stanacard, LLC v. Rubard, LLC*, No. 12-cv-5176, 2016 WL 462508, at *22 (S.D.N.Y. Feb. 3, 2016).[23]  Accordingly, each of Santos' additional common-law claims (Counts III–V) must be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Amended Complaint, with prejudice.

---

[21] *See also Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 49 (2d Cir. 2019) (contract claim against licensee "whose use arguably exceeds the scope ... of a license" is preempted where it "seeks solely to vindicate an exclusive right under the Copyright Act"); *Dow Jones & Co. v. Juwai Ltd.*, No. 21-cv-7284-PKC, 2023 WL 2561588, at *7–8 (S.D.N.Y. Mar. 17, 2023) (breach of a website's terms regarding "copying and reproduction" of the site's content was preempted because the contract claim concerned "the same right [plaintiff] seeks to protect through its copyright claim").

[22] *See also BroadVision Inc. v. Gen. Elec. Co.*, No. 08-cv-1478-WHP, 2009 WL 2603145, at *3 (S.D.N.Y. Aug. 13, 2009) (implied-contract claim was preempted to the extent it sought "unpaid license fees for excessive usage" beyond that permitted by license).

[23] *See also Bray v. Purple Eagle Ent., Inc.*, No. 18-cv-5205-GBD-SLC, 2024 WL 553961, at *8 (S.D.N.Y. Jan. 3, 2024) ("[T]he overwhelming majority of courts in this circuit have held that an unjust enrichment claim based upon the copying of subject matter within the scope of the Copyright Act is preempted.").

Dated: June 7, 2024

Respectfully submitted,

By: */s/ Nathan Siegel*

Nathan Siegel
Eric Feder
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
(202) 973-4200
nathansiegel@dwt.com
ericfeder@dwt.com

Raphael Holoszyc-Pimentel
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
(212) 489-8230
rhp@dwt.com

*Attorneys for Defendants James C. Kimmel a/k/a Jimmy Kimmel, American Broadcasting Companies, Inc., and The Walt Disney Company*