```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
GEORGE SANTOS,                          :
                          Plaintiff,    :
                                        :     24cv1210 (DLC)
              -v-                       :
                                        :     OPINION AND
JAMES C. KIMMEL, AMERICAN BROADCASTING  :        ORDER
COMPANIES, INC                          :
                          Defendants.   :
                                        :
--------------------------------------- X
```

APPEARANCES:

For plaintiff:
Andrew Mancilla
Robert Fantone
Mancilla & Fantone, LLP
260 Madison Avenue, 22nd Fl
New York, New York 10016

Joseph W. Murphy
185 Great Neck Road, Ste 461
Great Neck, New York 11021

For defendants:
Nathan Siegel
Eric Feder
Davis Wright Tremaine LLP
1301 K St NW , Ste 500
Washington, DC 20005

Raphael Holoszyc-Pimentel
Davis Wright Tremaine LLP
1251 Avenue of the Americas, 21st Fl
New York, NY 10020

DENISE COTE, District Judge:

     George Santos brings this action against James C. Kimmel,

American Broadcasting Companies, Inc. ("ABC") and the Walt

Disney Company ("Disney") for copyright infringement and related

state law claims.  The defendants have moved to dismiss the amended complaint ("FAC") pursuant to Rule 12(b)(6), Fed. R. Civ. P., principally relying on the fair use defense.  For the following reasons, the motion is granted.

## Background

The following facts are taken from the FAC, incorporated exhibits, and documents of which a court may take judicial notice.  For the purposes of deciding this motion, the complaint's factual allegations are accepted as true, and all reasonable inferences are drawn in the plaintiff's favor.

George Santos is a public figure and former member of the United States House of Representatives.  In May 2023, Santos was indicted on federal charges of, inter alia, wire fraud in connection with a fraudulent political scheme, money laundering, and theft of public funds.  He was expelled from Congress on December 1, 2023.

ABC is a commercial broadcast television network.  Kimmel is the executive producer and host of ABC's late-night talk show Jimmy Kimmel Live! ("JKL").  Disney is the parent company of ABC.

Shortly after his expulsion from Congress, Santos created an account on www.cameo.com ("Cameo"), a website that allows fans ("Users") to request personalized video messages from

public figures and celebrities ("Talent").  Santos's Cameo
account drew media attention as early as December 4, 2023.  On
December 6 and 7, defendants created multiple Cameo accounts
using fake names, and submitted at least fourteen requests for
Cameo videos from Santos using these accounts.  Santos created
fourteen videos in response.  This litigation relates to
defendants' public use of five videos on JKL.

By creating accounts on Cameo, Talent and Users agree to be
bound by Cameo's Terms of Service, which are incorporated by
reference in the FAC.  The Terms of Service provide that by
creating an account, the account holder agrees "not to create a
Site account using a false identity or providing false
information."  Under the Terms of Service, Users may request
personalized videos from Talent and obtain a license to use
those videos.

Cameo offers two types of licenses: personal use licenses
and commercial use licenses.  A personal use license grants the
User a license

> **solely for your own personal, non-commercial, and non-promotional purposes,** subject to these Terms: a non-exclusive, royalty-free, fully paid, worldwide, sublicensable, revocable license to use, reproduce, distribute, and publicly display that CAMEO Video, in any and all media (for example, on social media platforms), whether now known or hereafter invented or devised.

A commercial license grants "an exclusive (except as to the license granted to Cameo), royalty-free, fully paid, worldwide, sublicensable, irrevocable license to use, reproduce, distribute, and publicly display" the video on a variety of media for reasonable promotional purposes.  A commercial license "specifically exclude[es], in all cases, television."

Each video created by Talent is owned by the creator, but uploading a video grants Cameo "a non-exclusive, royalty-free, fully paid, unlimited, universal, sublicensable (through multiple tiers of sublicenses), perpetual, and irrevocable license in any and all manner and media" in that video.  Each of the defendants' requested videos were subject to the personal use license restrictions.

Defendants' Cameo requests included the following:

- "George please congratulate my friend Gary Fortuna for winning the Clearwater Florida Beef Eating Contest.  He ate almost 6 pounds of loose ground beef in under 30 minutes -- which was a new record! He's not feeling great right now but the doctor thinks he will be released from the hospital soon. Please wish him a speedy recovery!"

- "George please congratulate my mom Brenda on the successful cloning of her beloved schnauzer Adolf. She and Doctor Haunschnaffer went through a lot of dogs in the trial runs but they finally got it to stick.  Tell her to give Adolf a big belly rub for me!"

- "George can you please congratulate my legally blind niece Julia on passing her driving test.  They said she couldn't do it -- even shouldn't, but she's

taught herself to be able to drive safely using her
other senses.  She's not a quitter!  That said, the
day after she got her license, she got in a really
bad car accident so if you could also wish her a
speedy recovery that would be amazing.  She's in a
bodycast and is very bummed out -- but with help
from Jesus and President Trump, soon she will be
back on the road!"

- "Hey George.  My friend Heath just came out as a
  Furry and I'd love for you to tell him that his
  friends and family all accept him.  His 'fursona' is
  a platypus mixed with a beaver.  He calls it a beav-
  a-pus.  Can you say we all love you Beav-a-pus?  He
  also just got the go ahead from Arby's corporate to
  go to work in the outfit so we're all so happy for
  him to be himself at work and at home.  Could you
  also do a loud 'Yiff yiff yiff!'? That's the sound a
  Beav-a-pus makes as a Beav-a-pus.  Thank you so
  much."

Starting on December 7, Kimmel introduced a segment on JKL
called "Will Santos Say It?", which he introduced by stating
that "disgraced former Congressman George Santos . . . has a new
gig making videos on Cameo for $400 a pop."  Kimmel stated that
this was "a dilemma because on the one hand you don't want to
give your money to a guy like George Santos but on the other,
pretty good chance he had your credit card information already."
Kimmel stated that he sent Santos a number of "ridiculous
requests . . . . I didn't say they were from me I just wrote
them and sent them to find out 'Will Santos Say It.'"  Kimmel
then introduced three of the videos, each time asking his
audience "Will Santos Say It?" before playing the video in full.

Defendants ran the segment again on December 11. Before showing the videos, Kimmel remarked that "every time [President Donald Trump] gets indicted he rakes in the cash but George Santos [is] not doing too badly himself." Kimmel stated

> I sent [Santos] a bunch of crazy video requests because I wanted to see what he would read and what he wouldn't read, and I showed some of them on the air on Thursday . . . and now he's demanding . . . to be paid a commercial rate. Could you imagine if I get sued by George Santos for fraud?

He then showed two more of the videos. Defendants posted both segments on various social media, including Youtube. On December 12, Santos sent defendants a demand letter requesting them to cease showing the videos and remove the content from social media. Defendants did refrain from posting the remaining videos, but did not remove content they had previously published on social media platforms and the defendants' website. Santos has registered each of the videos shown on JKL (the "Videos") with the Register of Copyrights pursuant to 17 U.S.C. § 411(a).

Santos filed the initial complaint in this action on February 17, 2024, alleging copyright infringement, fraudulent inducement, breach of contract, and unjust enrichment. Following a conference on April 18, an Order of the same date set a deadline for the initial motion to dismiss and the filing of any amended complaint in response to that motion. The Order provided that it was unlikely that plaintiff would have a

further opportunity to amend.  The defendants moved to dismiss

the initial complaint on April 29.  Santos filed the FAC on May

24, adding an additional claim for breach of implied contract,

and defendants renewed their motion on June 7.  Defendants'

motion was fully submitted on July 3.

## Discussion

To survive a motion to dismiss brought under Rule 12(b)(6),

"a complaint must contain sufficient factual matter, accepted as

true, to state a claim to relief that is plausible on its face."

Doe v. Franklin Square Union Free School Dist., 100 F.4th 86, 94

(2d Cir. 2024) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678

(2009)).  "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the

misconduct alleged."  Vengalattore v. Cornell Univ., 36 F.4th

87, 102 (2d Cir. 2022) (quoting Ashcroft, 556 U.S. at 678).  "In

determining if a claim is sufficiently plausible to withstand

dismissal, a court "must accept as true all allegations in the

complaint and draw all reasonable inferences in favor of the

non-moving party."  Doe, 100 F.4th at 94 (citation omitted).

When assessing the pleadings on a motion to dismiss, a court

> may review only a narrow universe of materials, which
> includes facts stated on the face of the complaint,
> documents appended to the complaint or incorporated in
> the complaint by reference, matters of which judicial

> notice may be taken, as well as documents not expressly incorporated by reference in the complaint that are nevertheless integral to the complaint.

Clark v. Hanley, 89 F.4th 78, 93 (2d Cir. 2023) (citation omitted).

Defendants argue that the FAC fails to state a claim for copyright infringement because the complaint clearly establishes that their inclusion of the Videos on JKL constituted fair use. Fair use is an affirmative defense, and is thus most frequently resolved at summary judgment. An affirmative defense may be raised by a pre-answer motion to dismiss, however, "if the defense appears on the face of the complaint." Whiteside v. Hover-Davis, Inc., 995 F.3d 315, 319 (2d Cir. 2021) (citation omitted). The Second Circuit has specifically acknowledged "the possibility of fair use being so clearly established by a complaint as to support dismissal of a copyright infringement claim." TCA Television Corp. v. McCollum, 839 F.3d 168, 178 (2d Cir. 2016).

A.    Copyright Infringement

Exercising its constitutional power, Congress has granted an author of original work that is fixed in a tangible medium of expression the exclusive right to produce the work. See Google LLC v. Oracle America, Inc., 593 U.S. 1, 16-17 (2021). The purpose of the Copyright Act "is to secure a fair return for an author's creative labor," and "the ultimate aim is, by this

incentive, to stimulate artistic creativity for the general public good." Twentieth Cent. Music Corp. v. Aiken, 422 U.S. 151, 156 (1974) (citation omitted).

Section 501 of the Copyright Act provides that "[a]nyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 [of the Copyright Act] . . . is an infringer of the copyright or right of the author." 17 U.S.C. § 501(a). Under § 106, those rights include reproduction, public performance, public display, creation of derivative works, and distribution. 17 U.S.C. § 106. The various provisions of the Copyright Act reflect "a balance of competing claims upon the public interest: Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts." Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith, 598 U.S. 508, 526 (2023) (citation omitted).

"A claim of direct copyright infringement requires proof that (1) the plaintiff had a valid copyright in the work, and (2) the defendant infringed the copyright by violating one of the exclusive rights that 17 U.S.C. § 106 bestows upon the copyright holder." Smith v. Barnesandnoble.com, LLC, 839 F.3d 163, 166 (2d Cir. 2016). The defendants do not dispute that

Santos has a valid copyright in each of the Videos.  They argue, however, that the use of the videos constitutes fair use and does not violate Santos's rights, because "a copyright holder may not prevent another person from making a 'fair use' of copyrighted material."  Google, 593 U.S. at 18.  As explained below, they are correct.

1.   Fair use

Section 107 of the Copyright Act codifies the fair use doctrine and provides that

> the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.

17 U.S.C. § 107 (emphasis added).  To determine whether the use of a work is a fair use, the following factors must be considered:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

Id.

The statutory embodiment of the doctrine "indicates, rather than dictates," how the doctrine applies.  Google, 593 U.S. at 18.  All four factors listed in § 107 "are to be explored, and

10

the results weighed together, in light of the purposes of copyright." Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith, 11 F.4th 26, 37 (2d Cir. 2021) (citation omitted). The list of factors is not exhaustive. Google, 593 U.S. at 19. Instead, fair use is a "flexible" concept. Warhol, 598 U.S. at 527 (citation omitted). "[T]he party asserting fair use bears the burden of proof." Authors Guild v. Google, Inc., 804 F.3d 202, 213 (2d Cir. 2015). Each of the four factors is discussed in turn, and the results weighed together.

> i.   Purpose of Use

This factor "considers the reasons for, and nature of, the copier's use of an original work," with the central question being "whether the new work merely supersedes the objects of the original creation[,] (supplanting the original), or instead adds something new, with a further purpose or different character." Warhol, 598 U.S. at 528 (citation omitted). A use that has a further purpose is said to be "transformative." Id. at 529. Where a copied work is being used for one of the purposes identified in the preamble of § 107, there is a "strong presumption" in favor of fair use. NXIVM Corp. v. Ross Inst., 364 F.3d 471, 477 (2d Cir. 2004) (citation omitted). "Among the best recognized justifications for copying from another's work is to provide comment on it or criticism of it." Authors Guild, 804 F.3d at 215. This is because "[c]riticism of a work . . .

ordinarily does not supersede the objects of, or supplant, the
work.  Rather, it uses the work to serve a distinct end."
Warhol, 598 U.S. at 528.

Santos argues that because the defendants themselves
solicited the Videos, the defendants' subsequent use of the
Videos was not transformative.  Defendants argue that their use
of the Videos was squarely for purposes of criticism and comment
and thus this factor weighs in favor of fair use.  Defendants
are correct.

It is clear from the face of the FAC and the YouTube clips
of the JKL segments incorporated by reference into the FAC that
the defendants copied the Videos for the transformative purposes
of criticism and commentary.  As alleged in the FAC, Cameo is a
website that allows fans to "request personalized video messages
from public figures and celebrities."  The FAC asserts that
Santos created the Videos "to generate an inspiring message" and
"convey[] his feelings of hope, strength, perseverance,
encouragement, and positivity."  In contrast, any reasonable
observer of the JKL segments during which the Videos were shown
would understand that their inclusion on the show served as
criticism of and commentary on a newsworthy public figure.

Kimmel prefaced the broadcast of the first of the three
Videos by noting that the "disgraced former Congressman George

Santos has a new gig making videos on Cameo for $400 a pop,"
making a joke about Santos's indictment for wire fraud by
stating that there's a "good chance he already has your credit
card information," and stating that he had sent "ridiculous
requests" to Santos in order "to find out 'Will Santos Say It'."
Before showing each Video, Kimmel read the request to the
audience and asked the audience "Will Santos Say It?"  Kimmel
then played the Videos in full and, between Videos, interjected
his own commentary.

In short, a reasonable observer would understand that JKL
showed the Videos to comment on the willingness of Santos -- a
public figure who had recently been expelled from Congress for
allegedly fraudulent activity including enriching himself
through a fraudulent contribution scheme -- to say absurd things
for money.  Thus, the Videos were used for political commentary
and criticism, purposes that do not supersede the "objects" of
the original Videos.  Warhol, 598 U.S. at 539.[1]

---

[1] The Supreme Court has emphasized that it is not the subjective
intent of the user, or the subjective interpretation of a court,
that determines the purpose of the use.  Warhol, 598 U.S. at
544.  "But the meaning of a secondary work, as reasonably can be
perceived, should be considered to the extent necessary to
determine whether the purpose of the use is distinct from the
original, for instance, because the use comments on, criticizes,
or provides otherwise unavailable information about the
original."  Id. at 544-545.

Moreover, "a further justification for [JKL's] use of [the Videos] is apparent" in that the segments "target" the Videos. Id. at 539-540.  "[C]ommentary or criticism that targets an original work may have compelling reason to 'conjure up' the original by borrowing from it."  Id. at 532 (citation omitted). Here, "the original copyrighted work is, at least in part, the object of" Kimmel's commentary.  Id. at 540.  It is "the very nature" of the Videos -- that is, the fact that Santos was willing to read the requested messages on camera for $400 -- "that enables the commentary."  Id.

Santos's argument that the defendants should not be able to "seek refuge in the fair use concept of transformation that they themselves manufactured through deceit" finds no support in copyright law.  Defendants' conduct may have been deceptive and unkind, but the Supreme Court in Warhol emphasized that whether a work is transformative turns on neither the "subjective intent of the user," 598 U.S. at 544, nor the "stated or perceived intent of the artist."  Id. at 545 (citation omitted).  A court must instead conduct "an objective inquiry into what use was made, i.e., what the user does with the original work."  Id. Here, the purpose of the defendants' use was clearly for criticism and commentary of the Videos themselves and their author.

Santos also argues that the commercial nature of defendants' use and their "bad faith" in soliciting the videos weigh against fair use. But, while "a finding that copying was not commercial in nature tips the scales in favor of fair use . . . the inverse is not necessarily true, as many common fair uses are indisputably commercial." Google, 539 U.S. at 32. Here, even though JKL's use was in the course of a commercial endeavor, "that is not dispositive of the first factor, particularly in light of the inherently transformative role" of the Videos when shown on JKL. Id.

Next, an infringer acts in bad faith where it is aware that its access to the original "was unauthorized or was derived from a violation of law or breach of duty." NXIVM, 364 F.3d at 478. Even assuming that defendants acted in bad faith here by procuring personal-use licenses using accounts with fake names (rather than forthrightly negotiating a commercial fee), bad faith is not dispositive "of the fair use question, or even of the first factor." Id. at 479 (citation omitted). Here, "the first factor still favors defendants in light of the transformative nature of the secondary use as criticism." Id.

        ii.  Nature of Work

The second factor under § 107

> directs courts to consider the nature of the copyrighted
> work, including (1) whether it is expressive or creative or
> more factual, with a greater leeway being allowed to a

claim of fair use where the work is factual or
informational, and (2) whether the work is published or
unpublished, with the scope of fair use involving
unpublished works being considerably narrower.

Warhol, 11 F.4th 26, 45 (2d Cir. 2021) (citation omitted).  This
factor generally favors the fair use defense when a copyrighted
work is more "informational or functional" than "creative".  4
Nimmer on Copyright § 13F.06 [A] (2024).  The second factor has
"rarely," however, played a significant role in the
determination of a fair use dispute since even factual works are
entitled to copyright protection.  Authors Guild, 804 F.3d at
220.

The second factor of § 107 does not weigh strongly either
in favor of or against the fair use defense.  As to the first
subfactor, the FAC alleges that the videos were "created by
Santos using his own effort, creativity, and unique personality
traits" and "capture Santos's unique and distinctive form of
motivational expression both in the personalized and engaging
manner in which the videos are captured and in the originality
with which Santos conveys his feelings of hope, strength,
perseverance, encouragement, and positivity."  Although the
defendants wrote the messages, Santos added some language and
original touches.  Santos likely also made choices as a
videographer about lighting and framing of the Videos.  Taking
all allegations in the FAC as true and drawing all reasonable

inferences in favor of the plaintiff, the Videos are more expressive than factual.

The second subfactor favors defendants.  Santos's copyright registrations state that all of the Videos were published on the same days as they were created.  Per the Cameo Terms of Service, uploading a Talent video to the platform grants Cameo an irrevocable license "to use, reproduce, license, distribute, modify, adapt, publicly perform, publicly display, and create derivative works" of the video.  Uploading a video also grants to the User and the recipient (if different from the User) a non-exclusive, perpetual license to use, reproduce, distribute, and publicly display the video.  Pursuant to 17 U.S.C. § 101, "publication" includes "offering to distribute copies . . . to a group of persons for purposes of further distribution, public performance, or public display."  Thus, Santos published the Videos when he uploaded them to Cameo.  Because the first subfactor favors Santos and the second favors defendants, the second factor weighs against fair use, but only slightly so.

### iii. Portion of the Work

The third factor considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole."  17 U.S.C. § 107(3).  Even "a small amount" of copying may fall outside the scope of the fair use doctrine where the excerpt copied "consists of the 'heart'" of the original work.

Google, 593 U.S. at 33 (citation omitted).  On the other hand, a
court may consider whether the substantiality of the challenged
use "was tethered to a valid, and transformative, purpose."  Id.
at 34.  Copying "the entirety of a work is sometimes necessary
to make a fair use."  Swatch Group Management Services Ltd. v.
Bloomberg L.P., 756 F.3d 73, 90 (2d Cir. 2014).  The "ultimate
question under this factor is whether the quantity and value of
the materials used are reasonable in relation to the purpose of
the copying."  Warhol, 11 F.4th at 46 (citation omitted).

The third factor is neutral with respect to the fair use
defense.  It is undisputed that the Videos were aired in their
entirety on JKL; however, here, the use was transformative.  The
use of the Videos to criticize and comment on a public figure
would have been undermined by showing less than the entirety of
the Videos, because the audience would not know whether Santos
had indeed said everything in the requests.  Thus, the third
factor does not weigh against a finding of fair use.

iv.  Effect on Market

The fourth factor under § 107 considers "whether, if the
challenged use becomes widespread, it will adversely affect the
potential market for the copyrighted work" and for the market
for any derivative work.  Warhol, 11 F.4th at 48 (citation
omitted).  The question is whether the copying "usurps the
market for the first by offering a competing substitute."  Id.

at 48.  In weighing this factor, a court may consider where
appropriate any public benefits or harms from the copying and
their extent.  <u>Google</u>, 593 U.S. at 35-36.  There is, however,
"no protectible derivative market for criticism," because "[t]he
market for potential derivative uses includes only those that
creators of original works would in general develop or license
others to develop," and "the unlikelihood that creators of
imaginative works will license critical reviews or lampoons of
their own productions removes such uses from the very notion of
a potential licensing market."  <u>Campbell</u>, 510 U.S. at 592.

The fourth factor of § 107 does not weigh against a
finding of fair use.  If anything, it weighs in favor of fair
use.  Defendants' use of the Videos "are undoubtedly
transformative secondary uses intended as a form of criticism,"
and "[a]ll of the alleged harm arises from the biting criticism
of this fair use, not from a usurpation of the market by
defendants."  <u>NXIVM</u>, 364 F.3d at 482 (citation omitted).

Moreover, the "public benefits the copying will likely
produce" are "related to copyright's concern for the creative
production of new expression."  <u>Google</u>, 593 U.S. at 35.  That
is, the production of criticism and satirical commentary would
be stifled if users of a work were required to obtain permission
from its creator.  The public benefits of criticism are

"comparatively important . . . when compared with dollar amounts likely lost."  Id. at 35-36.

Santos argues that defendants' use devalued the market for Cameo videos, including Santos's, by "undermining the integrity" of the Cameo.com platform.  Santos does not explain how any impact on the popularity of the Cameo platform -- which is entirely speculative -- impacts more specifically the public interest in the creative production of new expression. Moreover, the FAC identifies no harm to the potential or existing market for the Videos that Santos created for the defendants, other than the "very use at bar."  Swatch, 756 F.3d at 91 (citation omitted).  Thus, this factor weighs in favor of fair use.

v.    Consideration of All Fair Use Factors

Taking all four factors into consideration, the defense of fair use is clearly established by the FAC and documents integral to it.  The defendants' use of the Videos was transformative; "transformative uses tend to favor a fair use finding because a transformative use is one that communicates something new and different from the original or expands its utility, thus serving copyright's overall objective of contributing to public knowledge."  Authors Guild, 804 F.3d at 214.  While the second factor weighs slightly against the fair use defense, the third factor does not, and the fourth factor

favors the defense.  Thus, defendants' motion to dismiss Santos's claim for copyright infringement is granted.

II.  Fraudulent Inducement

Santos alleges that by creating fake profiles and falsely representing themselves as fans seeking personalized videos for personal use, the defendants fraudulently induced Santos to provide the requested videos.  Defendants argue that his claim fails because he has failed to allege that he suffered any monetary loss as a result of their representations.  They are correct.

The elements of fraudulent inducement under New York law are 1) a misrepresentation or material omission of fact which was false and known to be false by the defendant 2) made for the purpose of inducing the other party to rely upon it; 3) justifiable reliance of the other party on the misrepresentation or material omission; and 4) resulting injury.  Ambac Assurance Corporation v. Countrywide Home Loans, Inc., 31 N.Y.3d 569, 578-79 (2018).[2]  Under New York's "out-of-pocket" rule, "damages are to be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate them for what they might

---

[2] Defendants cite New York law in their motion to dismiss. Plaintiff does not dispute that New York law applies to this action.  "[W]here the parties agree that [New York] law controls, this is sufficient to establish choice of law." Insurance Company of the State of Pennsylvania v. Equitas Insurance Limited, 68 F.4th 774, 779 n.2 (2d Cir. 2023).

have gained" in the absence of fraud.  Connaughton v. Chipotle
Mexican Grill, Inc., 29 N.Y.3d 137, 142 (2017) (citation
omitted).  New York law does not allow "damages for fraud based
on the loss of a contractual bargain."  Id. at 142-43 (citation
omitted).

Defendants are correct that the FAC fails to allege injury
resulting from any fraud.  The FAC alleges damages in an amount
no less than the difference between the cost the defendants paid
for the videos and the price of an expedited commercial license
for each video -- that is, the FAC seeks the "recovery of
profits which would have been realized in the absence of fraud,"
not out-of-pocket economic loss caused by defendants'
misrepresentations.  Id. at 142.  Thus, the claim for fraudulent
inducement is dismissed.

III. Breach of Contract

Santos next asserts breach of contract and breach of
implied contract claims against the defendants.[3]  The FAC alleges
that plaintiff and defendants entered into valid contracts for
personal licenses for all fourteen of the videos recorded by
Santos, and that defendants breached those contracts by a)
failing to pay the required amount for the use of the videos

---

[3] Santos abandoned his claim for unjust enrichment in his
opposition to the motion to dismiss.  Even had he not, this
claim would be preempted by the Copyright Act.  See In re
Jackson, 972 F.3d 25, 44 (2d Cir. 2020).

contemplated by defendants and b) providing false information in contravention of the Cameo Terms of Service.  Defendants argue that these claims are preempted by the Copyright Act and that, in any case, Santos has failed to allege the existence of an actual or implied contract between himself and defendants. These claims are dismissed as preempted by the Copyright Act.

"[T]he Copyright Act preempts state law claims asserting rights equivalent to those protected within the general scope of the statute."  Melendez v. Sirius XM Radio, Inc., 50 F.4th 294, 300 (2d Cir. 2022) (citation omitted).  Section 301 of the Copyright Act addresses the issue of preemption, stating that

> On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title.  Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a) (emphasis supplied).

A state law claim is preempted by the Copyright Act if it meets two requirements: a subject matter requirement and a general scope requirement.  Melendez, 50 F.4th at 300-01.  "The subject matter requirement of the test is satisfied when the plaintiff's claim applies to a work of authorship fixed in a

tangible medium of expression and falling within the ambit of one of the categories of copyrightable works." Id. at 301 (citation omitted).

For the general scope requirement of the test to be satisfied, "the state-created right may be abridged by an act that would, by itself, infringe one of the exclusive rights provided by federal copyright law." Id. (citation omitted). "In evaluating the application of this prong, a court looks at the right being asserted . . . and requires . . . that the right be equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 of the Copyright Act." Id. (citation omitted).  If the claim is "predicated upon an act incorporating elements beyond mere reproduction or the like," it will not be preempted.  Id. at 302.  "Rather than simply performing a mechanical search for extra elements," however, courts applying this test must engage in a "holistic evaluation of the nature of the rights sought to be enforced and then make a determination whether the state law action is qualitatively different from a copyright infringement claim." Id. (citation omitted).  Preemption thus turns on "what the plaintiff seeks to protect, the theories in which the matter is thought to be protected and the rights sought to be enforced." Universal Instruments Corporation v. Micro Systems Engineering,

Inc., 924 F.3d 32, 48 (2d Cir. 2019) (citation omitted).
Preemption "cannot be avoided simply by labeling a claim 'breach
of contract.'"  Id. (citation omitted).

Here, both the subject matter and general scope
requirements are met.  The state claims apply to the fourteen
videos created and copyrighted by Santos.  As to general scope,
the nature of the rights Santos seeks to enforce by his claims
for breach of contract (express or implied) are those protected
by § 106.

Santos's contract claims are based on two alleged breaches
by the defendants: first, that they failed to pay the required
amount for the use of the videos that they contemplated; and
second, that they breached the Cameo Terms of Service by using
false information to create Cameo accounts.  The first theory is
clearly preempted by the Copyright Act.  As defendants rightly
point out, any time a defendant is alleged to have exceeded the
scope of a license that was purchased, the parties could
hypothetically have agreed to a broader license covering the use
at a different price.[4]  The essence of that claim is thus that
defendants' use of the Videos exceeded the scope of the licenses
that they did purchase.  That is, the right Santos seeks to

---

[4] Further, the FAC itself acknowledges that neither the
commercial nor personal licenses permit Users to broadcast Cameo
videos on television.

enforce are equivalent to the right to publicly "perform" his copyrighted works.  17 U.S.C. § 106(4).

The second theory offered by the FAC is that defendants breached their contract with Cameo by providing false information in contravention of the Terms of Service, and that Santos can enforce this provision as a third-party beneficiary. Thus, he argues, his claim is "predicated upon an act incorporating elements beyond mere reproduction or the like," such that it is not preempted.  Melendez, 50 F.4th at 302.  This argument fails.  The FAC alleges that defendants' provision of false information to Cameo caused damages "in an amount no less than the difference between the cost that Defendants paid and the price of the expedited commercial licence[s]."  In other words, the FAC alleges that by lying about their identity, defendants deceived Santos into granting them personal, rather than commercial, licenses.

Thus, the FAC's contract claims are ultimately "aimed at stopping" the public display of his copyrighted works without a proper license, not at the defendants' use of false information to procure the Videos.  Id. at 308; see also Universal Instruments, 924 F.3d at 49 (holding Copyright Act preempts breach of contract claim against licensor for exceeding scope of purchased license).  "In other words, [Santos's] claims are in

no meaningful fashion distinguishable from infringement of a copyright." <u>Melendez</u>, 50 F.4th at 308.  Thus, defendants' motion is granted as to the claims for breach of express and implied contract.

## **Conclusion**

The defendants' June 7, 2024 motion to dismiss is granted. The Clerk of Court shall enter judgment for the defendants.

Dated:    New York, New York
          August 19, 2024

```
                            _____
                                  DENISE COTE
                            United States District Judge
```